WHITEHEAD et al. v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit.   October 4, 1917.)

No. 2942.

1. **Post Office** ⊂⇒48(4)—**Use of Mails to Defraud—Indictment—Describing Fraud.**

   Indictment under Pen. Code (Act March 4, 1909, c. 321) § 215, 35 Stat. 1130 (Comp. St. 1916, § 10385), for the use of the mails to defraud, need not state the fraud with the technical details required when swindling or a like crime is the subject of an indictment; a fraudulent design, while essential, being only an element of the crime, and the gist thereof being the use of the mails, though not necessarily with the result of consummating the design.

2. **Post Office** ⊂⇒48(4)—**Use of Mails to Defraud—Indictment—Negations.**

   The quoted language of the indictment for fraudulent use of the mails, charging that the scheme involved the misleading and deceiving of the person into the belief that he would, after a stated period, become entitled to and receive a loan, "when in truth and in fact" (1) "the loan or reserve fund would not be sufficient to provide said loan for said contract holder in said period of —— months"; (2) "and that he could not and would not, at the expiration of said time, receive said loan"; or (3) "it was altogether uncertain whether said contract holder would, at the expiration of said period of time, be able to obtain said loan on offering said security"—is intended to and does indicate wherein and how the scheme devised was fraudulent, and satisfactorily supplies a necessary element in the description of the device, and is not open to objection of constituting negations which are negative pregnants, conjunctive negations, and literal negations, and therefore void.

3. **Post Office** ⊂⇒48(4)—**Use of Mails to Defraud—Indictment—De Minimis.**

   The indictment for using the mails to defraud, alleging that the contract holder was fraudulently misled into the belief that the contract provided that he could secure a loan in six months, and negativing such an effect for it, need not allege that he could not get his loan in a greater period, to escape the rule of de minimis.

4. **Post Office** ⊂⇒48(4)—**Use of Mails to Defraud—Indictment—Quality of Scheme.**

   Ordinarily, at least, an indictment for using the mails to defraud is not subject to demurrer on the ground that the scheme is not apparently adapted to the accomplishment of the crime intended to be committed, but the quality of the scheme is for the jury; and such is the case where the scheme has the appearance of legality, is embellished with the legal phraseology and formality efficacious in concealing consequences and creating confidence, uses language excellently conceived to mean one thing and create the impression that it means something else, and important provisions, expressed in obscure language, are inconspicuously printed in small type on the back of the signed contract.

5. **Post Office** ⊂⇒48(4)—**Use of Mails to Defraud—Indictment—Describing Fraud.**

   The indictment for using the mails to defraud, in describing the fraudulent scheme, need not mention all the auxiliary devices, and so, though the contract used recites that an application is a part of it, the indictment need not set forth the application, which does not change the legal effect of the contract.

---

6. POST OFFICE ⬅48(4)—USING MAILS TO DEFRAUD—INDICTMENT.

There is no conflict between "tenor" and "in substance," in an indictment for fraudulent use of the mails, introducing a contract with the words, "a contract of tenor in substance as follows," but "in substance" modifies "tenor," and indicates that the contract is substantially as set forth.

7. CRIMINAL LAW ⬅1186(4)—HARMLESS ERROR—INDICTMENT—IMPERFECTIONS IN FORM.

Rev. St. § 1025 (Comp. St. 1916, § 1691), providing that an indictment presented in federal court is not to be deemed insufficient because of any defect or imperfection in matter of form only, which shall not tend to the prejudice of defendant, authorizes observance of the dictates of common sense.

8. POST OFFICE ⬅49—USE OF MAILS TO DEFRAUD—CHARACTER OF TRANS-ACTIONS—EVIDENCE.

The circumstances in evidence on prosecution for use of the mails to defraud, the terms of the contract, the character of the advertising, the conduct of agents of the company, and correspondence between the company and persons misled by the agents *held* sufficient to establish the fraudulent character of the transactions, intended to give the appearance of being in general those of a building and loan association.

9. CRIMINAL LAW ⬅410—EVIDENCE—DECLARATION OF AGENTS—SCOPE OF BUSINESS.

As establishing fraudulent intent on prosecution of a company and its managers for use of the mails to defraud, statements of agents of the company to prospective purchasers of contracts are admissible; the evidence clearly indicating an established course of business, and that the agents were expected to follow up the misleading advertising and contract by suppression of facts and misrepresentations.

In Error to the District Court of the United States for the Northern District of Alabama; Wm. I. Grubb, Judge.

Lee A. Whitehead and others were convicted under Pen. Code, § 215, and bring error. Affirmed.

Walker Percy, Augustus Benners, and E. N. Hamill, all of Birmingham, Ala., and Wm. S. Forrest, of Chicago, Ill., for plaintiffs in error.

Oliver D. Street, of Guntersville, Ala., for the United States.

Before PARDEE, WALKER, and BATTS, Circuit Judges.

BATTS, Circuit Judge. Lee and F. A. Whitehead, L. F. Harris, and the Standard Home Company were indicted for fraudulent use of the mails. Each of the 42 counts of the indictment charged that the defendants devised a scheme involving "the sale of contracts"; the contracts having pertinent features as follows:

(1) The purchaser paid at the time of the application $6, and was thereafter to pay $6 per month for 80 months. The first $6 were retained by the agent, and the first, second, and third monthly installments by the company; $4.75 of each subsequent monthly installment became a part of what was called a "loan and reserve fund," from which loans and cash settlements were made and certificates paid.

(2) After the payment of 6 monthly installments the owner became "eligible" for a loan "in the order of his application"; but if a loan were made before 12 monthly installments had been paid in, the bor-

---

rower would have to advance a sum to make the total equal to 12 installments.

(3) "When the owner is entitled to a loan or funds to purchase a home," he furnishes the abstract, executes a mortgage, and pays thereafter $7.50 per month and interest.

On the back of the formal contract were "Benefits, Provisions, and Requirements." Of these the following may be pertinent:

Section 6 gave the company 60 days to approve the property. Section 11 provided that "no officer or agent of the company, general, special, or state agent, has any authority to promise a loan." Sections 13, 14, and 15 provide, after 12 consecutive monthly payments had been made, the owner might secure certificate for the amount which he had paid into the loan and reserve fund, together with 3 per cent. interest for the average time of the payment, which certificate would mature after 80 months, and draw 5 per cent. interest. After 12 months the contract has a cash surrender value of 50 per cent. of the amount paid to the loan and reserve fund, together with 3 per cent. interest on the average time of payment. After 24 months the cash surrender value was 75 per cent. of the amount paid into the loan and reserve fund, together with 3 per cent. interest on the average time of payments. After 80 payments, the owner, "having refused the acceptance of a loan, or not having received a loan," was entitled to withdraw "the amount of his credit" from the amount paid to the loan and reserve fund, with "his pro rata earnings" therein, not to be less than $528, nor more than $720. Not wishing to accept this, he might wait until the amount to his credit reaches $720.

In 7 counts the indictment charged that the device described was for the purpose of defrauding persons unknown. Upon these counts the defendants were found not guilty and they will not again be referred to. In the others of the 42 counts it was charged that the design was against named individuals. With reference to them severally it was charged that the defendants would fraudulently, and with intent to induce the purchaser to buy said contracts and pay money therefor, conceal the fact that the loan was promised only in the order of its number and when a sufficient fund had accumulated, but would pretend to him and thereby fraudulently mislead and deceive him into the false and mistaken belief that if he would comply with the contract for 6 months (or some other period) he would become entitled to, and at his option would receive, the loan; when, as defendants knew, the loan fund would not be sufficient to provide for said loan at the expiration of the period, and that he could not and would not, at the expiration of the time, receive the loan, or (in another count) when it was altogether uncertain whether he would be able to obtain the loan. The use of the mails in carrying out the scheme was set forth.

The indictment covers 91 pages of the printed record. Notwithstanding the apparent completeness of the statement of the design and of the method by which it was to be carried out, the defendants each primarily filed 67 demurrers to each count. After judgment, by assignments of error, the attacks on the sufficiency of the indictment were increased to 85. It is not fair to assume from the number of the assignments that all of them are without merit, and each has been

examined with the same care as if this evidence of lack of confidence did not exist. Each assignment has been carefully considered, and none has been found which would appear to warrant a reversal of the case.

Embellished with an erudition almost innocuous because almost obsolete, and expressed with a clarity characteristic of the dialectical tergiversations of the medieval theological controversialists, some of the objections to the indictment and the argument in their support, involve processes of mental ratiocination not easily within the capacity of persons accustomed to deal with the law in its practical phases only. The conclusion, therefore, that the assignments are without merit is reached with diffidence. It is not more practicable for the court in the opinion to discuss each assignment than it was for counsel in the brief, and controlling conclusions only will be stated.

[1] As to a large number of propositions, the authorities invoked are cases of embezzlement, swindling, obtaining money by false pretenses, and the like. The difference between these offenses and the crime denounced by section 215, P. C., is very substantial. A prime purpose of the latter is to prevent the prostitution of the mail service. The incidental protection of the public from frauds supplements a service usually performed by the state. The devising of a fraudulent design is not enough to constitute the offense. The formulation of such a design, the scheme involving the purpose to use the mails, is insufficient. The offense involves the use of the mails in the consummation of, or in the effort to carry out, the fraudulent design. The gist of the offense is the improper use of the mails. While the fraudulent design is essential, it is merely an element of the crime. As where an indictment charges burglary to commit theft, the theft is not described with the same particularity as if theft were the offense, so, in charging the use of the mails to defraud, the fraud need not be stated with the technical details required when swindling, or a like crime, is the subject of the indictment. The consummation of the crime is not dependent upon the success of the scheme. The crime is complete before the letter designed to mislead or otherwise used in carrying out the scheme, is received by the intended victim. The person addressed may have the shrewdness to detect the fraud; or, being misled, he may be in such financial condition as to be proof against fraud. Neither fact will affect the crime. Neither the mental nor financial condition of the person against whom the fraud is directed, nor any action on his part or failure to act, will increase or diminish a crime completed when, a scheme to defraud having been devised, the mails have been used in an effort to make it effective. A consideration of these principles will render unnecessary a discussion of most of the propositions urged by defendants.

[2] A reference to the fundamental character of the offense will also be a sufficient commentary on defendants' dissertation upon negations. The indictment charges that the scheme involved the misleading and deceiving of the person named in the count into the belief that he would, after a stated period, become entitled to and receive a loan "when in truth and in fact" (1) "the loan or reserve fund would not be sufficient to provide said loan for said contract holder in said

series at the expiration of said period of —— months"; (2) "and that he .could not and would not, at the expiration of said time, receive said loan"; or (3) "it was altogether uncertain whether said contract holder would, at the expiration of said period of time, be able to obtain said loan upon offering said security."

The three quotations last made are called by counsel negations 1, 2, and 3. Of these it is said that they are "negations which are negatives pregnant," and therefore void; "conjunctive negations," and therefore void; and "literal negations," and therefore void. Whatever may be the technical learning with reference to the negations in indictments for obtaining money by false pretenses, perjury, and like offenses, there is no present occasion for its application. The language used is intended to and does indicate wherein and how the scheme devised was fraudulent. It satisfactorily supplied a necessary element in the description of the device.

[3] A contention to this effect seems to be made: The indictment alleging that the contract holder was fraudulently misled into the belief that the contract provided that he could secure a loan in six months, and negativing such an effect for the contract, did not allege that he could not get his loan in six months and one day; that the maxim de minimis would apply to one day; that one might do the things charged, and yet not be subject to the law. If this proposition were meritorious, it would not be possible to draw an indictment that would properly charge the offense here involved. Whatever period might be given to cover the additional time required to escape the rule de minimis would have another little period following it, which could just as well be the basis for an invocation of the rule.

[4] It is insisted that the indictment is insufficient because the scheme described is "not apparently adapted to the accomplishment of the crime intended to be committed." It could just as well be contended that, if it were apparent that the scheme was fraudulent, an indictment charging it would be void. It is scarcely practicable for a court, in determining a demurrer, to pass upon the feasibility of a scheme to defraud. Before hearing the evidence, the court would, perhaps, be warranted in acting upon the assumption that, if it had not been effective, no complaint would have been made.

It may also be well to concede to persons engaged in a line of business superior knowledge of its requirements for success. It is probable that no one who has not given the matter serious study for practical ends can fully realize the different degrees of ignorance and gullibility represented by the population of America. No scheme to defraud, however well conceived for evil results, would probably reach all of the people; and few schemes, however transparent, would fail to find some victims. Nor is the fact to be ignored that many persons, the subjects of suspicion, have, in the development of their enterprises, been themselves the victims of a dangerous combination of arithmetic and imagination. Without suggesting that it would be impossible for the scheme to defraud to be so entirely incapable of that end that a demurrer to an indictment describing it would have to be sustained, a

consideration of the quality of the scheme would ordinarily be within the province of the jury.

But, if the abstract legal proposition made by defendants were unquestioned, the ruling in this case would not be disturbed. A careful study of the elements of the scheme would premise the success it attained. The scheme had the appearance of legality. It was embellished with all the legal phraseology and formality so efficacious in concealing consequences and creating confidence. The language used was excellently conceived to mean one thing and create the impression that it meant something else. The contract used the standard device of referring to the application and making it a part of the contract—a part not within the custody of the owner. Important provisions of the contract, expressed in obscure language, were inconspicuously printed in small pica on the back of the signed instrument. These are favorite devices for businesses whose prosperity depends upon overreaching, and are not less useful to those who pass the hazy border into criminal fraud. The scheme primarily devised, improved by the suggestions of experience, was apparently well adapted to effecting an exchange of valueless promises for money. The indictment is not subject to the objection that the scheme it describes is not apparently adapted to the accomplishment of the crime intended to be committed.

[5] The contract recites that the application is a part of the contract. The application is not set forth in the indictment, and this fact is the basis of several assignments. It was not necessary that the contract be set forth in full or stated as completely as it was. The application did not change the legal effect of the contract. Its omission did not affect the validity of the indictment, nor was it in any way disadvantageous to defendants. While trapping the applicant into signing something which could subsequently be used in an effort to confuse him was evidently a part of the general scheme to defraud, there is no rule requiring that the description of a fraudulent scheme should mention all the auxiliary devices.

[6] In setting forth in the indictment the contract, the pleader introduced it with: "A contract of tenor in substance as follows." Many assignments are predicated on this clause, and in their support are lengthy arguments. The propositions might be condensed into this syllogism:

(1) Contradictory statements in an indictment render the indictment void.

(2) The words "tenor" and "in substance" are contradictory.

(3) The words "tenor" and "in substance" are used together in the indictment.

(4) The indictment is void.

The logic is perfect. If the premises were not erroneous, the conclusion would be unassailable. Neither etymologically, philologically, nor legally is there any necessary conflict between the words; and, as used in the indictment, the words "in substance" modify "tenor," and indicate that the contract is substantially as set forth.

Most of the attacks upon the indictment are apparently predicated upon the postulate that an indictment requires a character of English

composition entirely different from that used for any other purpose, and that, in a determination of its meaning, all the ordinary rules of interpretation are abrogated. With reference to every other instrument which comes before a court, an effort is made to ascertain the meaning intended by the writer. As to an indictment it is insisted that every possible effort should be made to divest it of meaning. A word too many avoids it; a word omitted is fatal. If a word or clause may be given a possible meaning antagonistic to another word or clause, that meaning must be given, rather than an obvious meaning which would be consistent.

Even when perversion of the language is not undertaken, perfection of expression is insisted upon. Many English words have more meanings than one, and a writer whose thoughts are entirely clear and logical must be content sometimes to have a question raised as to the meaning of the language in which he undertakes to give them expression. There is little in literature beyond the reach of the hypercritical. The Lord's Prayer and the Commandments have not escaped. One who can find 85 objections to the indictment in this case could probably suggest improvements in the Gettysburg speech. It is not quite reasonable to demand of prosecuting attorneys that they should show a talent for lucid and accurate expression, not expected of any other person. We shall decline to give aid in the maintenance of rules so manifestly in conflict with good sense, and so potently subversive of efficient administration of the law. The time of a court may be more profitably used than in the perpetuation of absurdities.

The objections which may properly be urged to the indictment are not such as may be charged to the representative of the government who drew the indictment. As heretofore stated, the indictment covers 91 printed pages. Every essential fact could probably have been stated in one-tenth of that space, except that it was conceived necessary to follow well-established forms and time-honored phraseology. It is to be regretted that prosecuting officers cannot feel safe in so drawing an indictment as to make it a simple and straightforward statement of the facts upon which the government depends for conviction. It is to be regretted, too, that the useless repetition in the counts cannot be obviated. Each of the 85 objections to the indictment is lacking in merit. But, if it had been suggested that the charges against defendants are obscured by excessive verbiage, the proposition would be considered with sympathy, because of inherent merit, and overruled with regret, because the forms used are sustained, perhaps required, by precedent.

But, if we have little sympathy with the effort to defeat the law by verbal gymnastics, there is every inclination to see that defendants are not deprived of any substantial right by any technical rule. On this account, we have examined all the assignments, notwithstanding some of the objections to the indictment were not properly raised in the trial court, and notwithstanding counsel for the government have made exceptions to the assignments and brief that may be meritorious.

[7] On the oral submission of the cause, counsel for defendants were called upon to point out wherein any harm or disadvantage or

prejudice had resulted to defendants from the assumed defects in the indictment.· Nothing more specific was indicated than that the defendants had been deprived of legal rights. If they·were deprived of a legal right by any ruling, the case should be reversed. They are entitled to be tried in accordance with law. They are entitled, however, to no more than a trial by law as the law is. They cannot invoke the law as it might have been, if the tendency to permit absurd technicalities to defeat the purposes of the law had not been checked by persistent public protest and stopped by tardy, but wise, legislation. In some of the states it is still possible for an omitted letter or a misspelled word to cancel a judgment of conviction. But this court is given statutory authority to observe the dictates of common sense. Rev. St. § 1025 (Comp. St. 1916, § 1691).

Not infrequently unsound propositions have become so incorporated into the jurisprudence as developed by the courts that they have become rules of property rights. They become the basis of legal advice. The lawyer considers it safer to follow a poor opinion than a good reason. In such case, disregard of, or change in, the rules as applicable to past transactions, might bring about unjust and inexcusable results. But no one ought to be held to have a vested right in the veteran absurdities of criminal procedure; no one should be permitted to plead that he would not have violated the laws of his country, except for his confidence that foolish and illogical rulings would continue to be observed, whereby he would have acquired immunity. The trial judge properly disposed of all issues made with reference to the indictment.

[8] In 479 additional assignments of error, the rulings of the trial judge in the admission of testimony and upon other matters are assailed. The excellent briefs enable us quickly to ascertain the limited number of real questions involved. The most important issue is whether the evidence is sufficient to sustain the verdict of the jury. There is very little conflict in the testimony; and, after the somewhat prolonged delay incident to the reading of the 4,000 pages of the printed record, the issue may be passed upon without hesitation. The circumstances depended upon by the government to establish the fraudulent character of the transactions of the defendants are the terms of the contract, the character· of the advertising, the conduct of agents of the company, and correspondence between the company and persons misled by the agents.

Counsel for defendants make the proposition that the scheme or device evidenced by the contract is not open to more criticism than some of the insurance contracts, and other financial transactions in which the mails are used, indulged in from day to day all over the country. This proposition could, perhaps, be acquiesced in without absolving defendants of guilt. The statement may be less an exoneration of defendants than an attack upon the officers charged with the enforcement of the law. Certainly, the contract of the Standard Home Company is not the only contract in use in which excessive and involved verbiage is used to conceal its character and to induce the careless or credulous to part with money upon the assumption that they are securing something which they do not get. It is even conceived possible that defend-

ants believed that that which they were doing was not in violation of law. There is evidence to indicate that they had the law before them always, and it may be they did not realize that they had crossed the ill-defined boundary line that lies between nonpunishable overreaching and criminal fraud. Whoever approaches the line, approaches at his peril.

The contract covers 24 pages of the record. In the form in which it reached the purchaser, the body of the contract, surrounded by a colored margin and ornamented by a big red seal and the cut of a palatial home, was made up of provisions which cover 4 of the 24 pages. The balance of the contract, covering 20 pages, is printed under the title "Benefits, Provisions, and Requirements," in small type on less than three-fourths of the other side of the paper. The difficulty of reading, however, is not comparable to the difficulty of understanding. Practically every paragraph is obscure and involved. Cognate matters are considered in paragraphs remote from each other. When otherwise difficult to prevent, clearness is obviated by referring to sections "on the back hereof." Every paragraph, except one, in the main part of the contract, refers to the loan. This deals with the maturity of the contract holder's obligations. The first 7 sections of the "Benefits, Provisions, and Requirements" are with reference to the loan, as are section 17 (two paragraphs), section 18 (three paragraphs), sections 19, 20, 21, and 22. Sections 13, 14 and 15 deal with settlements which may be made "provided no loan has been made or home has been purchased." Only after reading the main contract and 18 sections of the "Benefits, Provisions, and Requirements" will the contract holder find the provisions by which it is apparently determined whether he shall have a loan. Sections 19 and 20 provide for classes, series, and issues of contracts, determined by a process within the control of the "company." When an applicant for a contract is accepted, a contract will be issued in a "series and issue" then open, and receive "the next number in the order to the contract last before issued." "It is expressly agreed that the numbers given at the home office to applications and contracts shall be held and taken to be the proper numbers of the same." The owner of the contract, "in the order of his application," "out of the funds of the particular series," is entitled to a loan "immediately upon the receipt of such funds available for his contract." The sections from which these provisions are taken are long and the language obscure.

Any person, including one accustomed to reading and considering legal instruments, would, from a reading of the contract, assume that the business of the company was loaning money, and that the purpose of the purchaser of the contract in acquiring the contract was obtaining a loan. All the provisions with reference to cash settlements and certificates of payment, upon any except a most careful reading, would appear to be effective only when the purchaser shall have exercised an option not to take the loan. Repeated and careful readings of the contract will leave in the mind of a capable lawyer doubts as to its meaning in a number of respects. The language of the contract is well adapted to mislead persons not accustomed to considering legal in-

struments, and persons not familiar with business matters into assuming that they had, by purchase of the contract, acquired an opportunity of obtaining a home by paying monthly installments. Except for the misleading character of the contract, it would probably have been impossible for the company to have secured any degree of success. The business involves the idea of the contract holders' paying in money, a portion of which is to be put into the fund from which a small per cent. of them might borrow. The first payment of $6 is compensation to the agent for misleading them. The next three payments of $6 each were appropriated by the persons who devised and carried out the scheme. Out of each $6 thereafter paid, some of the persons who paid it in are permitted to borrow $4.75, under a scheme leaving it entirely within the control of the managers of the concern as to who the borrowers should be.

The experience of the company indicates that a large per cent. of purchasers, when they first see the contract, realize the improbability of securing a loan or getting any returns from their investment, and simply lose the first $6 paid in. Another large per cent. of the victims do not pay beyond the second or third installment, and do not reach the installment from which loans are made. Another considerable percentage of the contract buyers pay up to the time when they become "eligible" for a loan, when, realizing the difference between eligibility for a loan and securing the loan, they sacrifice all or a part of what they have paid. There is no probability that any person would have purchased the contract as an investment. The minimum maturity value was possible only by giving to some a part of that which others lost. The time of the payment was indefinite, the security was inadequate, and the amount payable contingent. If the contract holder considered the matter from the standpoint of securing a future cash settlement the best that he could hope for was to receive, after having made 12 payments, a little more than half of such part of the amount paid in by him as was permitted to reach the loan and reserve fund. Upon the payment of $78 by him, which would be the initial payment and 12 monthly installments, he would receive 50 per cent. of the 9 amounts, of $4.75 each, applied to the loan and reserve fund from the installments after the third, and he would be permitted to receive $3\frac{1}{2}$ per cent. interest on the average time of the payments. His total return on an investment of $78 would be $27.70. If he were induced to keep his money in the enterprise for as much as two years, his losses would be only the initial payment, the first three installments, $1.25 out of each subsequent installment, 25 per cent. of what was left, and the difference between $3\frac{1}{2}$ per cent. interest and the current rate.

In another connection some of the features of the contract suggesting fraud were mentioned. Other provisions, which could have been, and apparently were, improperly used, include one precluding inquiry as to whether a proper number had been given the contract; another, permitting temporary loans and other diversions from the funds pertaining to an issue; another, retaining control of transfers; another, giving the company control of the numbering of the contracts by authorizing it to determine the number to be placed in an issue,

and when and how they are to be filled. Notwithstanding all the money is furnished by the contract holders, they are entirely without a voice in its administration; and notwithstanding 20 pages of provisions, not one furnishes them any degree of protection.

The advertising of the company was not less misleading than the contract. In few instances only are there affirmative misstatements. The mendacity involved was more efficacious and less dangerous. The part of it which went into the papers was substantially confined to an announcement that the company was lending money at 5 per cent. The statement was untrue; but, even if it had explained that payments were monthly, and that interest was calculated on yearly balances, the rate was sufficiently under the current rate in the section in which most of the business was conducted to attract attention and excite inquiry. Another part of the advertising which preceded the sale of the contract was an appeal to the homeless who desired homes. The appeal was peculiarly to those who could hope to own a little home only. The loan unit was $1,000. It is true there were a number of loans for larger sums. So far as the facts were developed, these larger borrowers were connected in some way with the company. But, without reference to who was to get the money, it was evidently expected that persons of small means should furnish it. This was, perhaps, not because of any peculiar partiality for the money of any particular class, but indicated an appreciation of the fact that the easiest approach was to those whose aspirations for homes exceeded their experience in business.

Some of these cases presented heart-breaking experiences. Even church organizations were made to suffer—churches of the poor where contributions meant, not alone devotion, but sacrifice. The case of Alice Holman was not typical, because the entire pound of flesh was not exacted. She paid in $144, and $100 was returned to her, an amount sufficient to cover, not only all that she had contributed to the loan and reserve fund which the company held in trust, but $14.50 of the $58.50 charged by the agent and the company for receiving the $144. She was evidently of that class of colored women, held all over the South in affectionate esteem, who, big of heart and strong of arm, knowing no lines of race and having no thought of self, love and serve children and the sick, the weak and all who suffer. "I generally take care of the sick," she said. "I keep the home for orphan children at Ensley." Once a kindly one in the company's office said to her: "Woman, I want to tell you this; don't you turn loose that $12; if you do, it will be the last you see of it." She paid the $12 every month until one of the little girls became ill. "After the little girl was taken down," she testified: "I had to stop work. I told him (the president) about the little girl being down, and I could not work, and of course he said he could not do me any good, and he said, 'You will have to pay in for 12 months.' * * * When the little girl kept getting worse, I kept pushing them for the money, and the day she was a corpse I wrote him a letter that morning. I went to see him afterwards. * * * I told him the little girl died, and I had to get two white men to stand for me to bury the girl. * * *"

The following is a part of the advertising, directed evidently at persons whose income placed very humble homes only within their reach:

"You can lose $2,932.35. If you rent a $1,000 home for 10½ years and do not take advantage of the offer presented to you by the Standard Home Company, you certainly will not have the amount above mentioned. It does not seem possible that you would lose such large amounts just by renting a $1,000 home for 10½ years at $12.50 per month; however, we will show you the actual results in figures: Ten and one-half years' house rent at $12.50 per month is a loss of $1,575. You don't own the house, valued at $1,000. You have lost the difference between buying and renting, $357.35. Then you have certainly lost a total of $2,932.35."

Contemporaneously a bathetic appeal is made, which as ruthlessly attacks the English as the loss statement assaults the truth:

"The mother goes about her daily tasks with a song in her heart, serenely conscious that no grim stranger will throw the little ones and she out into a cold world, and that every loving touch she places upon things within its sacred walls is there to stay as long as she wills."

The advertising which followed purchase and disappointment will be referred to in another connection.

[9] The evidence principally depended upon by the government to establish a fraudulent intent were the statements made by the agents of the company to prospective purchasers of the contract. More than 100 witnesses were introduced, each of whom testified that the agent had, by statements, led him to believe that he would, at the end of six (or eight or some other number of) months, be able to secure a loan of $1,000 from the company at 5 per cent. interest. The introduction of this evidence was strenuously objected to by the defendants. The objection was upon the ground that the representations were not the representations of the defendants or the company. If there had been evidence of a single transaction only, or of isolated and occasional transactions, the contention might have appeared meritorious. But the accumulated evidence, aided as it was by evidence of the subsequent conduct of the company, and by the correspondence with which the misrepresentations were always followed up, clearly indicates an established course of business, an important feature of which was systematic misrepresentation by agents. It is apparent that the agents were expected to follow up the misleading advertising and misleading contract by suppression of the facts that should have been disclosed, and misrepresentations as to terms and effect of the contract. The agents realized, as the company realized, that the persons with whom they were dealing were not, in most instances, in a position to make investments, and that they were, in order to acquire homes, paying each month no inconsiderable part of their small incomes. They knew, and the managers of the company knew, that unless these persons were misled the contracts could not be sold.

A frequent course of events was that, after the agent, by his misrepresentation, had secured an application for a contract, and 6 months of installments had been paid, the contract purchaser would indicate to the company that he was ready for his loan. Thereupon the company would write him that it was true that he had now become "eligible" for a loan, but that he had not been reached in the order in which loans

were made. The purchaser would then make a statement of what had been said to him by the agent. Thereupon the company would express surprise that he had been misled, and would call attention to the fact that he, the purchaser, had made an application in which he had stated that he had read the contract and understood its terms. A response from the victim is to the effect that it is impossible for him to continue the payment of the installments upon the uncertainty of securing a loan; whereupon the company begins to send literature entirely new to the contract buyer, supplemented by letters, in which the purchaser is urged to continue his payment. It is argued, and many figures are used to establish, that the person who receives his loan last is really the one who gets most benefit from the contract. If this fails as a soporific, and the contract buyer undertakes to secure a cash settlement, the company expresses regret (no doubt, with all sincerity) that the contract holder has determined to stop payment of installments, and tries to show him that, outside the loan feature, the investment is a good one.

It is at this point that the example in compound interest is usually introduced. Among "the profits of the company and investors" is (says the advertisement):

"(2) Compounding or reloaning both principal and interest as paid monthly."
"The compounding of the interest and principal is not paid by a borrower, for few men are good enough financiers to compound their money, nor is it paid by the investor. It is simply made by the good plan of the company, and its able financiering. The illustration below shows $1,000 compounded at 5 per cent. interest per month for every month in the year for one year, which will verify our statement."

A table follows which shows that the $1,000 at that modest rate, compounded monthly for one year, will amount to $1,795.8320158071-29150348625. The company frankly acknowledges that it "does not have the advantage of compounding the entire thousand dollar loan every month." It abstains from suggesting that it does not get 5 per cent. per month for any part of it. If, notwithstanding the impressive figures quoted, the contract owner insists upon a cash payment, the next interesting fact developed by the correspondence is that he is not to receive even 50 per cent. of what he has paid in, but 50 per cent. of what he has paid in that has been appropriated to the loan and reserve fund, and that he would not get back any part of the $6 primarily paid in, any of the first three payments, or any part of $1.25 out of each of the subsequent payments. At this point the victim ordinarily takes what he can get.

The initial correspondence in most cases calls attention of the purchaser to the fact that he has signed an application in which it is stated that he has read the contract and understands its terms. The evidence shows that the agents, in many cases, would state to the prospective buyer that he did not happen to have a copy of the contract with him; and, in most instances, the first time the contract buyer sees the contract is when, after having made his initial payment, the contract is sent to him by the company. The application is signed by the purchaser, as applications ordinarily are, after having been prepared by the

agent, and after its terms have been explained to him by the agent. In very few cases was it the fact that the purchaser either saw the contract or had any knowledge of the provision in the application that stated that he had read and understood it.

The purchaser had a right to depend upon the statements of the agent, and a right to assume that the application and the contract were as represented by the agent. This right was not destroyed by the circumstance that the company undertook to relieve itself of responsibility for the acts of its "agents, general, special, and local." The course of business and uniform correspondence indicates that the provision referred to in the application, to the effect that the purchaser had read the contract and understood it, was put there as part of the scheme to defraud and as tangible defensive matter when correspondence became necessary, rather than for the purpose of having the purchaser know the character of the obligations he was assuming, and of the rights which he was acquiring.

Notwithstanding the large number of instances called to the attention of the company of misleading statements by agents, the record does not show a case in which such agent was discharged or reprimanded by the company for his misconduct, or compelled by the company to make restitution to the defrauded person. Nor is there a single case in which, after ascertaining that the purchaser had been defrauded, the company undertook to make him whole. The defendants who have been convicted were in active control of the affairs of the company. The representations made by the agents came to their attention. They permitted money to be taken by their agents with knowledge of the fact that the purchasers would not have parted with the money if they had not been deceived. In many cases they got the benefit of the first three payments with the knowledge that misrepresentations had been made; or, having gotten the benefit of these payments, and having the fact of misrepresentation brought to their attention, made no effort of any kind to restore the purchaser to his original condition. The correspondence brought to their attention in a very large number of cases the fact that application had been made by persons who had not read the contract, and, further, that in many cases where purchasers had read the contract they had misunderstood its terms and effect. The contract, as heretofore suggested, is calculated to mislead, and defendants knew that fact, because they knew that in a very great number of instances it had had that effect. It is apparent, not only that defendants knew that large numbers of persons were being misled by the agents, by the advertising and by the contract; but it is also apparent that they knew, and relied upon the fact, that many of the purchasers would soon realize that they had been defrauded, and would forfeit what they had paid in, or accept whatever they could get and surrender the contract. They knew, also, that many of the purchasers who might never realize that they had been defrauded would stop payment when they ascertained that being "eligible" for a loan had the same relation to securing a loan as being eligible to the presidency had to holding that high office. They knew, too, that the incomes of many of the

purchasers were not equal to paying rent and to paying installments while waiting for a loan.

Even if there were absence of evidence of specific cases of misrepresentation brought to the attention of defendants, familiarity with the general course of business would negative a claim of innocence. The contracts issued covered classes "A" and "B." In class "A" 11,804 contracts were written, covering business for five years, ending June 29, 1912. In this class 543 loans were made. One out of every twenty-one purchasers received a loan. Eighty-nine contracts were carried to maturity. Assuming a separate purchaser for each contract, 632 purchasers were permitted to get what all expected. Each of the other 11,172 purchasers lost all or a part of what he paid in.

Up to June 29. 1912, the company had sold 34,607 class "B" contracts. On 13,430 of these no payment was made except the first. These payments were made before the delivery of the contract. These persons, having paid $80,580, lost this amount and quit. No part of this went to the loan or reserve fund. At the time of the examination 8,643 of the 34,607, or just one-fourth, had forfeited their contracts after paying one or more installments, in addition to the first $6. Assuming only one installment by each of them, these persons paid in $103,816, receiving therefor no benefit of any kind, and no part of the money going to the loan or reserve fund. Nearly 64 per cent. of the purchasers having suffered a total loss of what they had paid in, another 5 per cent. took the partial loss of cash settlement. A fortunate 2.55 per cent. received loans; 2.16 per cent. obtained paid-up certificates, and the remaining one-fourth continued to hope and pay. Those who received loans waited an average of 25.16 months.

These facts of the business render unnecessary any further comment in support of the verdict of the jury. No error that would justify a reversal has been found in any ruling of the court.

The judgment is affirmed.

⊜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes