ADER v. UNITED STATES.*

SKOLNIK v. SAME.

(Circuit Court of Appeals, Seventh Circuit. July 22, 1922. Rehearing Denied October 14, 1922.)

Nos. 2935, 2937.

1. Post office ⬅48(4)—Indictment held sufficient although naming only class of persons intended to be defrauded.

An indictment for using the mails in pursuance of a scheme to defraud, in violation of Criminal Code, § 215 (Comp. St. § 10385), was not defective, as failing to name the persons intended to be defrauded, where it was alleged a class of persons was intended to be defrauded.

2. Post office ⬅35—Use of the mails need not be for communicating with person to be injured.

Under Criminal Code, § 215 (Comp. St. § 10385), it is an offense if the mailing is in execution of, or by way of, an attempt to execute the fraudulent scheme, and it is not necessary that the use of the mails be for communicating with a person intended to be injured.

3. Post office ⬅48(4)—Indictment held to sufficiently describe scheme to defraud.

In a prosecution under Criminal Code, § 215 (Comp. St. § 10385), for using the mails in pursuance of a scheme to defraud, the indictment held to sufficiently describe the fraudulent scheme, the selling of stock in a practically nonexistent meat packing business.

4. Indictment and information ⬅129(1)—Combining charges of violation of statute with conspiracy counts held proper.

In a prosecution under Criminal Code, § 215 (Comp. St. § 10385), for using the mails in pursuance of a scheme to defraud, the combining in the indictment of charges of violation of section 215 with conspiracy counts held proper practice.

5. Post office ⬅35—Mailing by one defendant of letter is act of all defendants.

In a prosecution under Criminal Code, § 215 (Comp. St. § 10385), for using the mails in pursuance of a scheme to defraud, held, that the act of one defendant in mailing a letter in pursuance of the scheme to defraud was the act of all defendants, where all connected with the scheme must have known that the mails would be used in its prosecution.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

*Certiorari denied 260 U. S. ——, 43 Sup. Ct. 247, 67 L. Ed. ——; 260 U. S. ——, 43 Sup. Ct. 247, 67 L. Ed. ——.

**6. Criminal law ⟨key⟩1209—Conviction under conspiracy counts and mail fraud counts held not to involve double penalty.**

In prosecution for fraudulent use of the mails, with conspiracy counts, *held*, that conviction under the substantive counts and also under conspiracy counts did not involve a double penalty.

**7. Post office ⟨key⟩49—Evidence held to sustain conviction for using mails to defraud.**

In a prosecution under Criminal Code, § 215 (Comp. St. § 10385), for using the mails in pursuance of a scheme to defraud, evidence of the fraudulent character of the scheme, the selling of stock in a practically nonexistent meat packing business, *held* sufficient to sustain conviction, although it appeared that a site was actually purchased and a plant was in process of construction.

**8. Conspiracy ⟨key⟩48—Evidence held sufficient to go to jury.**

In prosecution for conspiracy under Criminal Code, § 37 (Comp. St. § 10201), to use the mails to carry out a scheme to defraud, evidence as to the conspiracy *held* sufficient to go to the jury.

**9. Post office ⟨key⟩49—Evidence held to show participation by defendant in scheme to defraud by use of mails.**

In prosecution for using the mails to carry out a scheme to defraud, evidence *held* to show that one of the defendants did not act in a mere clerical capacity, but, with guilty knowledge of the scheme, associated herself with the other defendants in forwarding its object.

**10. Post office ⟨key⟩35—Defendants liable for fraudulent acts of agent of corporation in use of mails which they control.**

As respects liability for using the mails to carry out a scheme to defraud, the selling of stock in a practically nonexistent meat packing business, the fact that stock salesmen were employed by the corporation rather than defendants as individuals *held* immaterial, in view of evidence that the corporation was being used by the defendants in the execution of the alleged scheme.

**11. Criminal law ⟨key⟩622(1)—Granting separate trial held discretionary.**

In a prosecution for use of the mails to carry out a fraudulent scheme, *held*, that the trial court's refusal to grant defendants a separate trial was a matter within its sound discretion.

**12. Criminal law ⟨key⟩854(2)—Permitting separation of jury held within trial court's discretion.**

In a prosecution for using the mails to carry out a fraudulent scheme, *held*, that the separation of the jury during the trial was discretionary; care having been taken to properly caution the jury against permitting any outside influences.

**13. Criminal law ⟨key⟩1044—Defendants cannot complain that one of the jurors was approached when they did not ask leave to withdraw a juror on that ground.**

In a prosecution for using the mails to carry out a fraudulent scheme, where one of the defendants approached one of the jurors and said that he should never have been tried with another defendant, and that he should never have been indicted, the matter could not be complained of by such other defendant, where his counsel made no motion to withdraw a juror on such ground.

**14. Criminal law ⟨key⟩1156(1)—Denial of new trial in exercise of discretion not reviewable.**

Where the trial court considered affidavits offered with motion for new trial and exercised a discretion by denying the motion, his action was not reviewable.

**15. Criminal law ⟨key⟩1038(1), 1056(1)—Instructions not objected or excepted to below not reviewable.**

Where no objection or exception was made to the instructions in the court below, they were not reviewable.

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Edward J. Ader and Goldie A. Skolnik, with Abraham J. Messing, since deceased, were convicted of an offense, and bring error. Affirmed.

Edward J. Ader, Abraham J. Messing, and Goldie A. Skolnik, with others, were convicted under an indictment charging conspiracy to violate section 215 under section 37 of the Criminal Code (Comp. St. § 10201), and also violation of section 215 (section 10385), and bring error.

The indictment of 15 counts was returned against plaintiffs in error and five others, namely, Eli Pfaelzer, Edward H. Troost, Benjamin E. Turner, Louis A. Davis, and John M. Kantor. Defendants Pfaelzer and Davis pleaded guilty. As to the others demurrers were overruled, motions to quash denied, and a long trial ensued, all being found guilty on all counts. Motions for a new trial and in arrest being denied, judgments were entered and the defendants sentenced. Ader was sentenced to imprisonment for five years on each of the counts 1 to 13, inclusive, of the indictment such sentence to run concurrently, and for two years on each of counts 14 and 15, said sentence to run concurrently; sentence on counts 14 and 15 to begin to run at the expiration of the sentence on counts 1 to 14, and that he forfeit and pay to the United States a fine in the sum of $10,000. Miss Skolnik was sentenced to imprisonment in the county jail of Cook county, Ill., for six months, and that she forfeit and pay a fine of $1,000. Plaintiffs in error, Ader, Messing, and Skolnik, each prosecuted a writ of error, but by stipulation transcript, briefs, and arguments were presented and heard together. After submission of the cause here plaintiff in error Messing died, and, that event being suggested on the record, all proceedings in the cause with reference to him were ordered abated.

Counts 1 to 13, inclusive, of the indictment each charged a violation by all defendants of section 215 of the Criminal Code, while counts 14 and 15 charged a conspiracy under section 37 of said Code to violate said section 215. All counts succeeding No. 1 by reference incorporated a part or parts of the latter count, which, in brief, charged that the defendants at Chicago on and before February 1, 1918, devised a scheme for obtaining money and property from a certain class of persons by means of false and fraudulent pretenses and representations. The class of persons were described as those whom the defendants should "by means hereinafter described" induce to give, send, and pay their money and property to the defendants under the name of Consumers' Packing Company, then and at all times mentioned a corporation under the management and control of the defendants, for subscribing for and purchasing shares of stock in said corporation. The means described were charged to be representations and pretenses which were to be made in the name of the corporation to the persons above referred to by the defendants, either directly or through agents of the corporation, by means of oral and written statements, printed advertisements, prospectuses, etc., to the effect that the corporation was engaged in good faith in the business, commonly called the packing business, of purchasing live animals in stockyards markets where the same are sold, slaughtering such animals, and selling the meat resulting from such slaughter; that said business of said corporation had been, was, and would be a successful and paying business; that said persons would be greatly benefited financially by subscribing for and purchasing said shares of said stock, in that large dividends would be paid to them, and the value of the stock would be greatly enhanced over the price at which defendants were selling; that large dividends had in fact been paid by said corporation which had theretofore acquired a packing business, to wit, the business of Eli Pfaelzer & Sons, who for 30 years had been doing a successful packing business in the Union Stockyards at Chicago aforesaid, it being the intent of the defendants by said means to cause said persons to understand and believe that the said corporation had been, was, and would continue to be engaged in a bona fide and successful packing business, and that the exchanging of their money and property for shares of said stock in said corporation would for that reason be a paying and profitable investment. The

indictment further charged that, when devising the scheme, defendants well knew that said pretenses and representations were not and would not be true, but were and would be false and fraudulent, in that the corporation had not been, was not, and would not be engaged in good faith in the packing business, and that persons giving, sending, and paying their money and property to the defendants would not be benefited, financially or otherwise, by subscribing for or purchasing shares of stock, either by the payment of dividends thereon or by the enhancement of the value of the stock, and in that no dividends whatever had been paid upon the shares of stock out of its earnings or otherwise than out of the money and property received from the persons whom the scheme was designed to injure in exchange for the shares of stock, and that the corporation had not acquired any packing business at all from Eli Pfaelzer & Sons, and further charged that at all the times and at the place mentioned the defendants well knew and would well know that the Consumers' Packing Company had not been, was not, and would not be engaged in good faith in a packing business owned or acquired by it or in any successful or paying business whatever, except the business carried on by the defendants in the name of the corporation of disposing of stock in the corporation as above indicated, which was and would be a losing and unprofitable investment for such subscribers. The first count further charged that, having devised the scheme and artifice, and for the purpose of executing the same, the defendants placed and caused to be placed in the post office at Chicago for delivery by mail a letter addressed and to be carried by mail to one Fred Frazier, who is alleged to be one of the persons of the class of persons referred to in the indictment. Counts 2 to 13, both inclusive, contain appropriate references to the scheme and artifice for obtaining money and property by means of false and fraudulent pretenses and representations described in the first count, and each count charged the mailing of a letter in execution of such scheme. All except counts 5, 6, 7, and 9 charged the person to whom the letter mailed was addressed to be one of the class of persons whom it was intended by the scheme to injure as alleged in the first count. This allegation is omitted in the four counts last enumerated, each of which discloses that the letters were not intended for such a person, the letter set out in count No. 5 being to a Mr. Fomund, then acting as stock sales manager for the Consumers' Packing Company in New York City, urging him to greater efforts in stock salesmanship. The letters set out in counts 6 and 7 were both addressed and charged to have been mailed to Mr. Emerson, secretary of state of the state of Illinois, and related to the continuance of the packing company's license to sell its stock under the Illinois Blue Sky Law, so called while the letter set out in the ninth count was addressed to Mr. Terry at Viola, Ill., soliciting him to become a local representative and stock salesman of the packing company in his community.

The fourteenth count charged a conspiracy on the part of all of the defendants to commit the several offenses charged in the first 13 counts of the indictment "by the means and in the manner set forth in the first count"; the overt acts charged being the several acts of placing in the post office the letters mentioned in the preceding 13 counts. The fifteenth count charged the defendants, with having conspired among themselves and divers other persons to the grand jurors unknown to offend against section 215 of the Criminal Code, and that the defendants so conspired in devising a scheme and artifice for obtaining money and property by means of false and fraudulent pretenses and representations described in the first count of the indictment, and that the defendants among themselves and with other persons conspired, for the purpose of executing such scheme and artifice, to place, and caused to be placed, various letters, writings, circulars, and pamphlets in the post office at Chicago. For overt acts this count presents the mailing of the letters and other writings mentioned in the first 13 counts of the indictment, and also several additional letters not mentioned in previous counts of the indictment, as well as acts of some of the defendants in presenting resolutions to meetings of the board of directors of the packing company, the signatures to minutes of various meetings wherein dividends were authorized to be paid, the signing by the defendant Pfaelzer of minutes of a

directors' meeting, authorizing a credit to Pfaelzer of some $45,000 for labor, energy, effort, and skill expected to be furnished and exercised by Pfaelzer on behalf of the corporation, the ordering of printing by other defendants, the insertion of advertisements in newspapers, there being some 10 overt acts alleged in addition to those severally set out in the first 13 counts of the indictment.

The facts developed by the testimony are too numerous and complex to warrant an attempt to outline them in detail, but their purport may be briefly sketched as follows: The Consumers' Packing Company was organized as a corporation, under the laws of the state of South Dakota in the month of February, 1918, and continued in business until the month of April, 1919, when its affairs were wound up in bankruptcy proceedings in the District Court for the Northern District of Illinois, Eastern Division. In December, 1917, one Eli Pfaelzer was engaged in business in the stockyards in Chicago and was associated with his two sons, Monroe and Ellard. Their business was that of meat brokers or jobbers, and consisted of buying meat products from packing plants, and particularly that operated by Guggenheim Bros., and selling the same in and about the city of Chicago. The business was conducted under the name of Monroe Pfaelzer, and its physical assets consisted of a desk and telephone located in the Guggenheim plant, together with a few automobile trucks in which the meats were delivered to customers. The nature of this business, together with its physical assets, remained substantially unchanged throughout the period to which this recital relates. Eli Pfaelzer had been employed at the Chicago stockyards for many years and had conducted the business above referred to with his sons for approximately three years prior to February, 1918. Louis Pfaelzer & Sons and Bernhard Pfaelzer & Sons were two well-known firms engaged in business in the stockyards. In December, 1917, plaintiff in error Ader seems to have conceived the idea that a packing house proposition in Chicago was a good one, and suggested his idea to a stock salesman by the name of Samuel C. Kops, and at the time also suggested that Eli Pfaelzer would fit in well as a practical packer, and Kops was directed by Ader to see whether he could organize a number of stock salesmen to successfully dispose of the stock. At Ader's suggestion, Mr. Messing applied for and secured a charter of incorporation from the state of South Dakota, the authorized capital stock of the corporation being placed at $1,000,000. The incorporators were Samuel C. Kops and two of his associate stock salesmen, Jacob Wallenstein and Bernhard Rosenow. The organization of the corporation was completed in February, 1918, and officered as follows: Eli Pfaelzer, president and general manager; Bernhard Rosenow, vice president; A. J. Messing, secretary and treasurer. Besides these men, there were on the board of directors four others, two of whom were placed upon the board without being first apprised of that fact, together with the defendant Benjamin E. Turner and plaintiff in error Edward J. Ader. None of the incorporators invested any money in the organization. Ader and Messing each received 500 shares of stock, for which they gave nonnegotiable notes bearing no interest. Immediately after its organization an extensive campaign to sell the stock of the corporation was inaugurated and continued throughout its business life. The company had its main office in Chicago, and later on opened offices in New York City, Boston, Pittsburgh, and Cleveland for the purpose of selling its stock, having more than 100 salesmen in Chicago and vicinity, and the stock was sold through the efforts of these salesmen and by means of prospectuses distributed by them and through the mails and by means of correspondence carried on by the use of mails. While the packing company secured an option from Eli Pfaelzer to purchase all the latter's stock, implements and utensils, automobiles, trucks, etc., dated February 25, 1918, by the terms of which the packing company might elect to purchase the property mentioned at a valuation to be appraised, but not to exceed $50,000, and there is evidence in the record by way of a purported bill of sale dated March 16, 1918, from Eli Pfaelzer & Sons to the packing company covering the property of the former, it is undisputed that in fact the business of Eli Pfaelzer & Sons, so far as it existed or the business of Monroe Pfaelzer, was continued in its operation by the Pfaelzers without

284 F.—2

any change until the month of November, 1918, and that at no time did the Consumers' Packing Company receive a dollar from the operation of the Pfaelzer business. In the month of November, 1918, the Monroe Pfaelzer bank account was garnisheed by some third party, necessitating a change in their methods of doing business, and for a time thereafter the bills of the Pfaelzer business were paid by the Consumers' Packing Company until December 17th, at which time the packing company opened an account with the Guggenheim concern and bought some livers, tails, beef tenders, brains, and tripe to the amount of $452.12 during the period from December 17, 1918, to February 4, 1919, when the packing company discontinued that line of activity. It will be noted that the packing company thus suspended its brief incursion into the meat business prior to the institution of the bankruptcy proceedings, which were commenced February 15, 1919. It is the government's contention that the bill of sale above referred to was never so executed and delivered as to be effective, and prominent among the facts upon which the contention is based is the provision of the option for the making of an appraisal, a purported written appraisal signed by one witness who testified he knew nothing about it, the fact that the consideration claimed to have been paid for the transfer of the Pfaelzer property, to wit, 5,000 shares of stock in the packing company, was turned back to the corporation by Pfaelzer to be used in the payment of increased commissions to stock salesmen as hereinafter indicated, together with the statement contained in one of the prospectuses ordered printed by plaintiff in error Ader some time in August, 1918, in which it is stated that the Consumers' Packing Company * * * has an option on the business of Eli Pfaelzer & Sons. At all events, except for the short period from December 17, 1918, to February 4, 1919, the Consumers' Packing Company was not itself engaged in any meat business, and during that time its operations were carried on at a loss. In fact, its activities were confined to the disposal of its stock and the acquiring of a site and the construction of a packing plant thereon. It appears that at the time when plaintiff in error Ader and the defendant Pfaelzer first opened negotiations with reference to the matter Pfaelzer had a verbal arrangement or option with Guggenheim Bros. for the purchase of certain lands in the stockyards for $150,000, and later, after it was determined to proceed with the Consumers' Packing Company venture, Pfaelzer secured a written option on the property which was turned over to the packing company, and in the spring of 1918 negotiations were had between officers of the packing company and Guggenheim Bros., resulting in a contract for the purchase of the lands for $140,000, and during the period under consideration here all but $20,000 of this purchase price was actually paid. In the spring of 1918 contracts were let for the building of a modern packing house upon the lands obtained, and on March 1, 1919, the sum of $171,090.61 had been expended in the construction of the building. It was in October, 1918, that the first operations by way of dismantling old buildings upon the site were commenced. So far as appears from the evidence the construction of the new building went steadily forward until the corporation was thrown into bankruptcy. Probably the activities of the Consumers' Packing Company as a corporation are summarized with sufficient accuracy by stating that they were confined to disposing of its capital stock, the acquisition of a site and partial construction of a packing house, the furnishing of funds for Eli Pfaelzer & Sons to continue the business during the month of November, 1918, and the carrying on of the small meat jobbing business from December 17, 1918, to February 4, 1919. Its principal business, however, is clearly shown by the evidence to have been the marketing of its capital stock. This was done in the main through organizations which denominated themselves fiscal agents. The first of these fiscal agents was a partnership which went under the name of S. C. Kops & Co., which was organized very shortly after the organization of the Consumers' Packing Company and upon the suggestion of plaintiff in error Ader. The partners were Ader, Messing, S. C. Kops, A. E. Kops, Jacob Wallenstein, and Bernhard Rosenow. The four last named were all associated together as stock salesmen, and Rosenow was vice president and director of the Consumers' Pack-

ing Company. A contract was entered into between S. C. Kops & Co. and the Consumers' Packing Company whereby the former were to sell the capital stock of the latter and receive 25 per cent. on the par value of the stock sold, plus a $2.50 bonus above par for their services and expenditures in selling stock. It became known that the Illinois secretary of state objected to so high a commission, and another contract was executed between the two concerns whereby a smaller percentage of commission was apparently agreed upon, and the latter contract was submitted to the secretary of state, but as between the parties thereto the original contract was retained as the basis of settlement. Plaintiff in error Ader and Messing shared equally with the other partners in Kops & Co. in the earnings of the partnership. Kops & Co., however, was short lived, and there followed a short period in which the corporation sold the stock direct, defendants Kantor and Davis acting as sales managers upon substantially the same basis of compensation, and later other fiscal agencies were organized known respectively as the J. H. Mitchell Company and the L. A. Davis Company, in all of which, however, plaintiff in error Ader was interested and received a share in the commission. In fact, during the sales managerships of Kantor and Davis, Ader demanded and received a share of the commissions. Plaintiff in error Skolnik was also an officer of the Mitchell Company, or at least acted as such, as will be more fully stated later on. Plaintiff in error Ader was active in opening the branch offices above mentioned, in assisting in the securing of salesmen, in distributing prospectuses and advertisements to the salesmen, and to the New York papers, in which he was assisted by plaintiff in error Skolnik. At the main office in Chicago the fiscal agencies, so called, occupied the same suite of offices with the Consumers' Packing Company. The state authorities of Ohio limited the sale price of the stock to $10 per share, and, as already indicated, the secretary of state of Illinois, in whose care was the issuance of licenses for the sale of such securities, limited the commission to be paid by the packing company to 20 per cent. of the par value of the stock, and considerable evidence was developed showing the methods by which the fiscal agencies and the corporation circumvented such limitations. The act of Eli Pfaelzer in turning back to the corporation 5,000 shares of the stock issued to him (ostensibly in payment for his business) for the purpose of raising extra funds with which to pay the fiscal agents, so called, has already been referred to. Other blocks of promotion stock were similarly handled. Early in 1919 plaintiff in error Ader caused a check to be signed for $4,000 in favor of his brother for legal services ostensibly, but the check was in fact issued with a view to using the proceeds in the payment of excessive commissions. The officers of the Consumers' Packing Company, and particularly plaintiff in error Ader, took a prominent part in the preparation of the prospectuses, advertisements in the newspapers, and in instructing and advising with the stock salesmen in the employ of the corporation or the fiscal agencies, and in carrying on correspondence through the mails concerning the sale of the stock.

From the outset these prospectuses and advertisements, though worded with considerable care, clearly asserted that the Consumers' Packing Company had acquired control of a going packing business theretofore owned and successfully operated by Eli Pfaelzer & Sons. Early in the campaign it was asserted that the last-named firm had been successfully established in the stockyards at Chicago for more than 30 years, but upon pressure brought by the Illinois secretary of state this was corrected to assert Eli Pfaelzer's success as a packer for a period of 30 years and the success of the firm of Pfaelzer & Sons for many years. In these advertisements the idea was fostered that the Consumers' Packing Company was operating a packing plant already existing which only needed to be enlarged; that the gross business theretofore conducted by Eli Pfaelzer had been built up by him to an amount annually in excess of $2,-000,000; that the business being conducted by the Consumers' Packing Company through Eli Pfaelzer & Sons consisted of slaughtering animals and the dressing of meats, at times the representation being that such business was conducted at the plant of Eli Pfaelzer & Sons, and at other times that such slaughtering was being conducted at the packing plant of Guggenheim Bros., who received the offal for their services. The gist of the repre-

sentations which the evidence shows was systematically insisted upon was that the Eli Pfaelzer & Sons business, control of which had been acquired by the Consumers' Packing Company, was a bona fide. packing business consisting of the buying of cattle, slaughtering the same, dressing and disposing of the meat products in a plant for years successfully operated, but upon a small scale, the purpose of the Consumer's Packing Company being to enlarge and extend an already existing and profitable business. Prior to July 1, 1918, the advertisements and prospectuses and sales talks of the salesmen laid stress upon the earnings of the large packing companies located at the stockyards in Chicago as indicating what properly might be expected in the way of earnings by the Consumers' Packing Company, when it had extended and developed the existing packing business of Eli Pfaelzer & Sons, but shortly before July 1st the representations took the form of statements as to the amount of killing that was being done by the Consumers' Packing Company and the profit that had already been made in the operation of the business, and that a dividend on the basis of 16 per cent. annually would be paid July 1st, and in July, 1918, a dividend of 4 per cent. was declared and paid to those stockholders who had fully paid their stock subscriptions. These dividends, however, were paid out of the moneys received in payment for stock, and not out of any earnings of the corporation. In November, 1918, a similar dividend of like amount was declared and paid. After the declaration of the first dividend the salesmen were provided with canceled dividend checks with which to impress prospective buyers, and the fact that dividends were only paid to those stock purchasers who had paid in full for their purchases was also used to incite those who had subscribed for the stock to make their payments promptly. The representation that the business then operated by the Consumers' Packing Company was paying dividends equal to 16 per cent. per annum was used effectively as a basis of the claim that the business would be extended to a gross business of $25,000,000 annually, yielding enormous profits to the fortunate investors. To those more cautious prospects, who desired to investigate personally before investing, the plant of Guggenheim Bros. was shown, and some were given to understand that the cattle of Eli Pfaelzer were being slaughtered at the Guggenheim plant on behalf of the Consumers' Packing Company for a charge by way of the retention of the offal as already indicated, while others were given to understand that the Guggenheim Bros. plant was the Pfaelzer plant. On some occasions halves of beef stamped with the letter P were referred to in such manner as to lead the prospect to believe that the P stood for Pfaelzer and meant that the meat belonged to Eli Pfaelzer & Sons, while in fact it had no such meaning, but, on the contrary was to be read with another letter appearing upon the corresponding half of beef and indicated ownership by an entirely different concern.

While the company was put to considerable expense in connection with the sale of its stock by way of securing approval of its issue on the part of the Capital Issues Committee of the federal government, and securing licenses to sell in the various states from the state authorities having charge of such matters, its main expenditures seem to have been by way of commissions to the various fiscal agents, so called. Of the sums so received by them, a substantial amount is shown by the evidence to have finally been received into the private bank accounts of plaintiff in error Ader and a smaller amount received by plaintiff in error Skolnik. The net result of the operations of the packing company from the month of February, 1918, until March 1, 1919, was that the company had net tangible assets valued at $353,973.05, while the cash receipts on sales of the capital stock totalled on said day $807,101.62, leaving upwards of $453,000 expended substantially in the sale of its capital stock, a loss to Eli Pfaelzer of $27,000 and the payment of $13,206.70 by way of the dividends above referred to.

It is not deemed necessary to outline in detail the part which plaintiff in error Ader played in the program outlined above. The idea of organizing the corporation was conceived by him, and he and Kops discussed the necessity of having a going business as a nucleus for the Consumers' Packing Company in order that the stock might readily be sold, and it was at his suggestion that the corporation was organized and the initial stock selling force gathered.

The evidence shows clearly that Ader was the presiding genius of the entire enterprise, and it was he who took pains immediately upon a director being given that office to obtain the latter's undated resignation in order that, as was testified by one witness, Ader might "pull it at any time." There is some testimony tending to indicate that Pfaelzer deceived plaintiff in error Ader into thinking that the Pfaelzer business was a packing business and a going concern earning substantial profits, but the evidence also shows that Ader and Pfaelzer had been acquainted for some time previous to the organization of the Consumers' Packing Company, and the close supervision which Ader had over all matters of the corporation make it hardly credible that he did not know fully what the Pfaelzer business in fact was. He on various occasions addressed the stock salesmen, formulated sales talks for them, prepared and made the suggestions with regard to the prospectuses, suggested the formation of the various so-called fiscal agencies, shared in their commissions, and during the period when Kantor and Davis were acting as sales managers selling the stock of the company direct to the subscribers insisted upon sharing in their compensation. There is evidence tending to show the payment of money direct from the Consumers' Packing Company treasury to Ader's private account or to that of the Abbott Investment Company, a mercantile or collection agency owned by him, without return of any kind, and there is ample evidence indicating that a substantial part of the funds paid to the various fiscal agencies ultimately came into the possession of Ader. He oversaw the opening of the New York office and informed the salesmen employed by that office that the corporation was paying dividends of 16 per cent. per year, 4 per cent. quarterly, and he arranged for advertisements in various publications containing the representations or statements of fact in substance as alleged by the government. He took part in the securing of permission from various state authorities to sell stock of the corporation in those states. When it transpired that the secretary of state of Illinois desired an audit of the books of the company in order to determine whether to permit the continuance of the sale of the company's stock in Illinois, and it became important that accounts should be furnished such auditors showing the result of the operation of the Pfaelzer business from March, 1918, to the time of the audit in December, 1918, the testimony indicates that Ader was cognizant of, and a party to, the manufacture of stockyard accounts and planned to have plaintiff in error Skolnik so copy the statement of accounts compiled by the witness Theobald so that such accounts would appear as though made from time to time in the usual course of business. It is in evidence that in January, 1919, after it had been determined that the January, 1919, quarterly dividend would not be paid, and when a subscriber for stock came into the offices of the company with $1,000 to complete the payment of his stock and refused to pay the money over unless he was assured that the dividend for January would be paid, Ader directed that he should be so assured, and the evidence is replete with letters signed by Ader and received by the addressees in the usual course of the mails relating to the sale of stock, the payment for same, and the remittance of dividends. In April plaintiff in error Ader became the secretary and treasurer of the company, and remained such until his resignation after proceedings in bankruptcy had been commenced.

Plaintiff in error Skolnik had been for some time prior to the organization of the Consumers' Packing Company a stenographer and confidential clerk of plaintiff in error Ader, and the evidence tends to show that beginning in April, 1918, she was active in the affairs of the Consumers' Packing Company; that she corresponded with various subscribers for stock in the corporation and sent out letters of about the same tenor as were usually sent out from the office of the company upon similar subjects and on occasion she signed letters as assistant secretary and treasurer of the company. She delivered the prospectuses complained of to the salesmen for the company, and had such insight into the accounts of the company that one witness, an accountant, testified that he sought information from her about items in the accounts which he did not understand. It appears that she was secretary of the J. H. Mitchell Company, having and exercising, as such, authority to withdraw funds of that concern from the bank. It appears that she withdrew such funds in favor of both plaintiff in error Ader and Mr. Messing; that she

had signed checks of the Mitchell Company, for various amounts in favor of Ader and Messing, respectively during the period from May to July, 1918, and yet, in December, 1918, denied knowledge of who the J. H. Mitchell Company were, as testified by Dehler, an auditor engaged in making an audit of the Consumers' Packing Company's books. On occasion she signed checks in favor of the Mitchell Company on the bank account of the Consumers' Packing Company, evidently with authority. Although denied by her, as is in fact much of what has been related with regard to her, the defendant L. A. Davis testified that in February, 1919, he asked Skolnik to obtain some canceled checks from the bank, and when the witness received them from Skolnik a number of them were missing, among which were some payable to Skolnik, and one of considerable amount to Ader, and that when asked what had become of these missing checks she said: "A little bird must have destroyed them." Again, it is in evidence that she sold a small amount of stock in the Consumers' Packing Company, making about the usual representations with reference to dividends, and received the usual commission.

It was plaintiff in error Skolnik to whom was assigned, and who performed, the duty of keeping track of sales from the 5,000 shares of stock which had been issued to and then returned by Eli Pfaelzer.

Jacob G. Grossberg, of Chicago, Ill., and Wallace Streeter, of Washington, D. C. (Jas. Hamilton Lewis and Edward Maher, both of Chicago, Ill., of counsel), for plaintiffs in error.

Chas. F. Clyne, U. S. Atty., and Edwin L. Weisl, Asst. U. S. Atty., all of Chicago, Ill., for the United States.

Before BAKER and ALSCHULER, Circuit Judges, and LUSE, District Judge.

LUSE, District Judge (after stating the facts as above). This record presents some 44 assignments of error, under which are presented 91 legal propositions in support of the contentions for reversal by plaintiffs in error. Mr. Messing's death, and the resultant abatement of proceedings as to him, renders it unnecessary to consider some of these, but the number remaining is sufficiently large to render it inadvisable to deal with each separately within the compass which this opinion may reasonably take. All have had careful consideration.

[1] The sufficiency of the indictment is challenged on several grounds, the first of which is a failure to name the persons whose money or property it is alleged the scheme or artifice was devised to obtain. In this connection the language of the first count is illustrative of all of the counts, and charges that the defendants devised a scheme and artifice for obtaining money and property from "a certain class of persons, then resident in divers states of the United States, by means of false and fraudulent pretenses and representations, that is to say, from the persons whom said defendants should, by means hereinafter described, induce to give, send, and pay their money and property to said defendants under the name of the Consumers' Packing Company."

In each of the counts, save the fifth, sixth, seventh, and ninth, it is averred that the letter set out and alleged to have been mailed was to "a person who then was one of said persons of said class of persons." In the counts just enumerated this phrase is omitted, and it is apparent from the character of the letters set out that they were not mailed to persons whose contribution in money or property was sought. The gist of these letters has already been stated. In our view it is quite apparent that the indictment charges the equivalent of a scheme to

obtain the money or property of the public and whomsoever thereof might respond to the inducements and representations to be made by the means as charged "of oral statements and divers letters and printed advertisements and prospectuses." Under the scheme as charged the defendants could not themselves know, when they devised it, the particular persons who would be injured. It was the proper province of the indictment to describe the scheme as it was devised as accurately as possible, and in those cases where the scheme is of the nature of a dragnet to capture all of the public who may be attracted to and entangled in its mesh, without regard to individuals, it would quite clearly be inaccurate and misleading to attempt to name the persons designed to be injured. To do so would characterize the scheme as one aimed at the particular individuals, when in fact the scheme as devised did not do so. As we view it, the scheme here set out as alleged to have been devised contemplated the public as its field of operation, and we see no reason for requiring that those who may be injured as the scheme is executed be named nor excuse given for omitting their names. The nature of the scheme is itself sufficient reason for the omission. The indictment, in our opinion, falls outside that under consideration in the case of Larkin v. U. S., 107 Fed. 697, 46 C. C. A. 588, and within the class considered in the case of Mounday v. U. S., 225 Fed. 965, 140 C. C. A. 93, and Finnegan v. U. S., 231 Fed. 561, 145 C. C. A. 447.

[2] As to counts numbered 5, 6, 7, and 9, the additional objection is made that the letters mailed were not alleged to have been to any person of the class of persons whom it was intended to injure. It does appear, however, that each of the letters was written and mailed for the purpose of forwarding the alleged scheme. Under section 215, C. C., it is an offense if the mailing is in execution of or by way of an attempt to execute the scheme. It is not necessary that the use of the mails be for communicating with a person intended to be injured. Larkin v. U. S., 107 Fed. 697, 701, 46 C. C. A. 588; Preeman v. U. S., 244 Fed. 1, 156 C. C. A. 429. It was said in the Larkin Case:

"It is within 'the statute if, in aid of the scheme to defraud, the mails be used to open correspondence with the intended victim, or 'any person.' "

Quite clearly each of the letters set out in each of the four counts last enumerated comes within that category.

[3] On the oral argument it was earnestly urged that the indictment fails to allege sufficiently the scheme or artifice by which it was designed to obtain money or property by false and fraudulent pretenses; reliance being had on the decision of this court in the case of Dalton v. U. S., 127 Fed. 544, 62 C. C. A. 238. There the indictment failed because the statements as to the scheme to defraud were so placed with reference to the description of the class of persons intended to be defrauded as to have no force, except as part of such description, and in addition there were no positive allegations of the falsity of the pretenses, such allegations appearing only in the "whereas" clause, so called. Thus in the Dalton Case the indictment charged that the defendant "had devised a scheme to defraud a class of persons not capable of being resolved into individuals, * * * that is to say, such of the persons, being publishers of newspapers * * * as should accept and

publish * * * a certain advertisement. * * * " At the places following the words "that is to say," where omissions have been indicated above, appeared words from which it could be inferred that the advertisement was one purporting to be sent by a regular advertising agency entitled to credit, and then followed the language "whereas, in truth and in fact, the Independent Advertising Agency aforesaid was not a bona fide advertising agency at all, but was a fictitious and fraudulent concern contrived" for the purpose of inducing the persons to be defrauded to accept and publish said advertisement on credit. The phrase "that is to say" quite clearly presaged a more detailed description of the class of persons only. In the instant case, however, the language is that the defendants did devise a scheme and artifice for obtaining money and property from "a certain class of persons * * * by means of false and fraudulent pretenses and representations, that is to say, from the persons whom said defendants, should, by means hereinafter described, induce to give * * * their money and property to said defendants * * * upon pretenses and representations, to be made * * * to the effect," and here followed the substance of the alleged representations, after which appear the positive allegations that the defendants "by said pretenses and representations" intended to have "said persons" believe in the existence of the facts represented to exist, and then appear positive and direct allegations that such pretenses and representations were and would be false to the knowledge of defendants, and pointing out wherein their falsity had, did, and would lie. No formal rule exists requiring that in indictments of this nature the description of the class of persons designed to be injured shall be in any particular manner separated from a description of the scheme devised. By placing the phrase "that is to say" immediately after the reference to the "false and fraudulent pretenses and representations," it is made clear that the pleader intended thereafter to describe such pretenses and representations. When, however, he inserts immediately after the phrase "that is to say" a description of the persons designed to be injured, no one, it seems to us, would fail to understand that the language following the phrase "that is to say" was designed to describe, not only the class of persons, but the fraudulent pretenses and representations as well. In other words, the phrase "that is to say," we believe, quite plainly introduces allegations both as to the persons to be injured and the scheme by which the injury was intended to be inflicted. Further, the weakness inherent in the mere recitals introduced by the word "whereas," made prominent in the Dalton Case, is entirely absent here. We apprehend that the defendants were apprised by this indictment with reasonable certainty of the nature of the accusation to the end that their defense might be properly prepared and a judgment be pleaded in bar to any subsequent prosecution for the same offense, and hence is not open to this attack.

[4] Combining in the indictment charges of violation of section 215, C. C., with conspiracy counts, is also complained of. Despite criticism of the practice found in a few opinions cited by counsel for plaintiffs in error, the propriety of such practice is, we believe, altogether too well settled to warrant question at this time. Sidebotham et al. v. U.

S., 253 Fed. 417, 165 C. C. A. 159; Preeman v. U. S., 244 Fed. 1, 156 C. C. A. 429; Jacobsen v. U. S. (C. C. A.) 272 Fed. 401; Ryan v. U. S., 216 Fed. 37, 132 C. C. A. 257; U. S. v. Rabinowich, 238 U. S. 85, 35 Sup. Ct. 682, 59 L. Ed. 1211; Kelly v. U. S., 258 Fed. 392, 169 C. C. A. 408; Schwartzberg v. U. S., 241 Fed. 348, 154 C. C. A. 228. Indeed, in their reply brief counsel for plaintiffs in error state:

"The misjoinder we complain of is not so much that disclosed on the face of the indictment, although we point out that this practice also has been criticized. But our complaint is that when the evidence developed, and it was apparent that there was no real proof of any conspiracy, so much of the mass of evidence as against each defendant became so irrelevant as against the others that the court should not have permitted the joint trial to proceed."

Thus the real contention is based upon the claimed absence of proof of conspiracy. In view of our conclusion hereinafter stated that there is evidence to sustain the finding of conspiracy, the real basis of counsel's complaint in this regard fails.

[5] It is also contended that as to each of the first 13 counts of the indictment, charging violation of section 215, there was a misjoinder of defendants, in that as to each count the particular letter therein charged to have been mailed can be ascribed only to the defendant who mailed or caused the same to be mailed. In view of what was said in Preeman v. U. S., 244 Fed. 1, 156 C. C. A. 429, this contention cannot be upheld. It was there said:

"Without the use of the mails the formulation and execution of the fraudulent scheme would have been an utter impossibility. It follows that all who participated in the scheme contemplated the use of the mails in the execution of their common design; and when to this end" two of the defendants "made use of the mails it was not only on their own behalf, but as well on behalf of their coparticipants, and their acts in this regard became the acts of each of them. This is not less true where the prosecution is under section 215 than under the charge of conspiracy."

This language, we believe equally applicable to this case. The magnitude of the operations charged and proven here, together with the methods used by way of advertisements in the newspapers, the distribution of prospectuses by mail and otherwise, the maintenance of branch offices in various important cities of the country, the sending of stock salesmen broadcast throughout the land, all show conclusively that all connected with the enterprise must have anticipated and known that the mails would be used in its prosecution as a matter of course.

[6] Next it is urged that conviction under the substantive counts and also under the fourteenth count, which charges conspiracy to devise the scheme and to use the mails for the purpose of mailing the letters, all as stated in the first 13 counts, involves a double penalty. This question it is not deemed necessary to determine. No reversal should result here, even if the contention of the plaintiffs in error should prevail in this particular, for if conviction of plaintiff in error Ader was proper under the fifteenth count and any one of the first 13 counts, it must be affirmed; and, if conviction of plaintiff in error Skolnik was proper under any single count of the indictment, it also must be affirmed. Pierce v. U. S., 252 U. S. 239, 40 Sup. Ct. 205, 64

L. Ed. 542; Abrams v. U. S., 250 U. S. 616, 40 Sup. Ct. 17, 63 L. Ed. 1173; Claassen v. U. S., 142 U. S. 140, 12 Sup. Ct. 169, 35 L. Ed. 966. The fifteenth count charges conspiracy and alleges numerous acts done to effect its object by way of letters mailed, meetings held, minutes signed, etc., in addition to the letters set out in the other counts. That the fifteenth count, therefore, was properly combined with the first 13 counts, is established by the authorities already cited, and that conviction and sentence does not constitute a double penalty is ruled by the opinion of this court in the Preeman Case, supra, 244 Fed. 1, 156 C. C. A. 429.

[7] It is further urged that the facts proven on the trial are insufficient to sustain the judgments against plaintiffs in error in that they are not inconsistent with innocence, indicating nothing more than exaggeration or trickiness of method at the most, and that the evidence in fact demonstrated that legitimate business was being promoted and conducted.

The facts have already been sketched. Aside from details which serve to arouse suspicion and characterize the enterprise as trickily dishonest, such as designating the business of Monroe Pfaelzer as that of Eli Pfaelzer & Sons, in striking resemblance to the names of the two other firms of Pfaelzer & Sons; the advertising of the personnel of the so-called advisory board, the ostensible chairman of which knew nothing about it; the circumvention of the regulations of the state licensing authorities; the "fiscal agency" devices for abstracting funds from the treasury of the corporation; the increase of the authorized capital stock from $1,000,000 to $5,000,000; the sending out of notices to the salesmen that the price of the stock would go up "next Monday"; the giving of the impression that the beef marked with a P in the Guggenheim plant was that of Pfaelzer—aside from these and numerous other details that might be mentioned, there is the evidence to the effect that the stock-selling campaign was from the start based upon the representations that a small packing plant and business was owned or at least controlled by the Consumers' Packing Company which formed the nucleus for the upbuilding of the $25,000,000 annual business predicted for the enterprise, and that the business was a going, profitable one which had already attained a volume of $2,000,000 annually and that such business was being conducted by the corporation, cattle were being slaughtered in considerable number daily, and that by July, 1918, the business warranted the payment of a dividend of 4 per cent., or at the rate of 16 per cent. per annum. Contrasted with these representations, the jury were entitled to find that the transfer of the Monroe Pfaelzer business was in fact never effected, or, if it was, not a dollar of its earnings found its way into the treasury of the packing company, and that no packing business with the stability and money investment implied thereby was either owned, controlled, or operated; that the business of Monroe Pfaelzer had at no time exceeded the gross amount of $800,000 per annum; that the Consumers' Packing Company was engaged in no productive business, earned no dividends, and that the dividends paid were paid out of the moneys received in payment for the capital stock of the corporation for the purpose of inducing further

purchases of stock. The evidence tends to prove that from the beginning plaintiff in error Ader, with S. C. Kops, fully understood that successful financing of the enterprise required that an existing business be found and used, and Eli Pfaelzer came in to furnish that requisite. The promotion of the corporation was based upon the idea that in order to be successful it was necessary to represent that a small, but successful, packing concern was being financed, and needed only to be properly financed and enlarged to become a tremendous success to the profit of the fortunate investors in its capital stock.

It is urged that a valuable site was obtained and a modern packing plant was being constructed at the time when the affairs of the corporation were wound up; that in February, 1919, prior to the institution of the bankruptcy proceedings, the sum of $20,000 was deposited in a state court as a fund to which dissatisfied purchasers of stock might resort to compensate themselves, and that thus is established conclusively the good faith of the enterprise. We do not believe those facts are to be given such far-reaching effect. The deposit of the funds in the state court was in a receivership proceeding and was deposited under a species of duress, a price paid for the dismissal of the receivership proceedings, and, while such deposit was a fact properly to be considered by the jury in arriving at the good faith of the enterprise, it is hardly of sufficient weight to overcome the evidence of the existence of a scheme to obtain money by false and fraudulent pretenses. So also was the fact that a site had been acquired and a plant in process of construction. The evidence discloses that, with the purchase of the site and the commencement of the construction of the plant, such facts were much stressed for the purpose of effecting sales, and in view of the fact that the authorized capital stock had been so substantially increased with intent, no doubt, to continue the sale thereof, we think it was for the jury to give to the facts the effect they deemed them entitled to. It is within the probabilities that the money expended for the land and plant was expended for a purpose similar to the expenditures for unearned dividends. Furthermore, as said in Foster v. U. S., 178 Fed. 172, 101 C. C. A. 492:

"The fact that the business conducted was an actual business does not prevent its being within the statute, provided it was the basis of a fraudulent scheme."

See Sparks v. U. S., 241 Fed. 777, 154 C. C. A. 479; Bettman v. U. S., 224 Fed. 819, 140 C. C. A. 265; McConkey v. U. S., 171 Fed. 829, 96 C. C. A. 501.

[8] We are therefore of the opinion that the jury were warranted in finding that a scheme to obtain money and property of the subscribers to the stock of the Consumers' Packing Company by false pretenses and representations within the meaning of section 215, C. C., in fact existed. Likewise, in our judgment, the existence of the conspiracy was properly a jury question. Ample circumstantial evidence was presented to warrant the jury in concluding that an agreement was arrived at to devise and execute the plan of selling the stock of the corporation by means of false and fraudulent representations, and to use the mails for its execution. The evidence also affords proof of the overt acts set

in the fifteenth count, thus warranting the jury in finding the violation of section 37, C. C., charged in the last-named count. That the violation of both the latter statute and section 215, C. C., charged in the indictment, were brought home to plaintiff in error Ader by the evidence, cannot well be doubted.

[9] As to plaintiff in error Skolnik, it is insisted that she was a mere employee of the Consumers' Packing Company, and as such merely acquiesced in, but took no part in, forwarding the scheme, and in so far as she made use of the mails it was done in a mere clerical capacity. But the evidence not only tended to prove that she was engaged in various capacities as a clerk, cashier, and bookkeeper, but also that she acted as assistant secretary and treasurer of the Consumers' Packing Company and that she was the secretary of the J. H. Mitchell Company, and in addition she appears to have voluntarily assumed to assist both herself and the other defendants by making sales of stock, and a careful scanning of the record which her contentions have elicited leads us to believe that there was ample evidence upon which the jury might find that Skolnik, with guilty knowledge of the scheme, associated herself with the other defendants in forwarding its object. Whether her participation went so far as to warrant her being held a coconspirator under the fifteenth count it is unnecessary to decide. Proper conviction under any one of the first 13 counts will, as has already been indicated, sustain the judgment against her. None of the letters bearing Miss Skolnik's signature are made the subject of any of the 13 substantive counts, but the evidence discloses that on August 29, 1918, Miss Skolnik received from Mr. Shaw money in payment for the stock which is the subject of the indictment letter to him, set out in count 2. In November, 1918, she used the mails to correspond with William C. Janz, and a letter to him dated January 25, 1919, in execution of the scheme, is made the subject of the twelfth count of the indictment; also the indictment letter of the thirteenth count of L. Kaplan was preceded by correspondence between him and Miss Skolnik in reference to his stock. Under these circumstances we are of the opinion that the jury were warranted in finding, at least as to the 3 counts last hereinabove mentioned, that the use of the mails as charged in those 3 counts was brought home to Miss Skolnik. In this connection it should be borne in mind that, as said in Schwartzberg v. U. S., 241 Fed. 348, 154 C. C. A. 228:

"The gist of conspiracy is the agreement, the substance of an offense under section 215 is the prosecution of a fraudulent purpose, toward the execution or fulfillment whereof the mail is used. One may form and accomplish it, with or without assistance; but all who with criminal intent join themselves even slightly to the principal schemer are subject to the statute, although they may know nothing but their own share in the aggregate wrongdoing."

Complaint is made because evidence going to show the good intent of the defendants was excluded. If this were so, undoubtedly it would be serious, but the error assigned relates to the exclusion of certain testimony sought to be elicited upon the cross-examination of the defendant L. A. Davis, originally a defendant, but who had pleaded guilty, and who was testifying as a government witness. The evidence

sought was not properly cross-examination, and no error can be predicated upon the court's ruling. Foster v. U. S., 178 Fed. 165, 177, 101 C. C. A. 485.

Error is also assigned upon the ground that in the cross-examination of plaintiff in error Skolnik government's counsel was permitted to introduce in evidence in the trial of this case the remarks and opinions of the District Judge expressed during the investigation of the affairs of the packing company in bankruptcy proceedings. This error is based upon a misapprehension of the record as we read it. The opinions of the District Judge were expressly excluded by the trial court. Some of his questions as they were put to the witness in the bankruptcy proceedings were verbatim, and the substance of others were put to the witness with the usual question as to whether she had not answered such questions in a particular manner on the prior hearing, thus following substantially the usual course of handling such matters. We see no error here.

[10] It is earnestly insisted that prejudicial error was committed in permitting various witnesses to relate the statements to them of various salesmen who approached them in endeavors to sell the stock of the packing company. The claimed errors are grounded: First, upon the alleged want of evidence showing the authority of the salesmen to represent the defendants; and, second, the absence of authority on the part of the defendants to said salesmen to make the representations testified to. As to the first ground, it may be said that in all or nearly all cases the activities of the salesmen were followed up by the defendants, or some of them, in the usual course of business, and their authority thus properly established, or, in any event, sufficient evidence was offered to authorize the jury to find such authority. That the salesmen were employed by the corporation rather than the defendants as individuals is immaterial in view of the evidence warranting the jury in finding that the corporation was being used by the defendants in the execution of the alleged scheme to defraud.

"It is a rule of the criminal law as well as the civil that corporate agencies cannot shield themselves behind the corporation, where they are the actual and efficient actors in committing a fraud or an offense." Kelly v. U. S., 258 Fed. 392, 401, 169 C. C. A. 408, 417, and cases cited.

With reference to the second ground of attack upon this class of evidence, it may be observed that, while there was some variation in the statements of the various agents, the evidence tended to show an established course of business by way of sending out agents with intent that such agents should make representations with reference to the alleged existing Pfaelzer plant, its business, the existing business of the Consumers' Packing Company, its profits and dividends, and, upon the whole, we are of the opinion that the statements of the various salesmen were of the same general import as the defendants designed they should make, and that the admission of such evidence was not and did not constitute prejudicial error. See Whitehead v. U. S., 245 Fed. 385, 396, 157 C. C. A. 547.

[11] A number of alleged irregularities in the course of the trial below are also complained of. First among these is the refusal of the

trial court to grant defendants a separate trial. In the very nature of things, from what has already been said, it must be clear that no error was committed in this regard which the plaintiffs in error may take advantage of. This was a matter peculiarly within the sound discretion of the trial court. U. S. v. Ball, 163 U. S. 673, 16 Sup. Ct. 1192, 41 L. Ed. 300; Sparf v. U. S., 156 U. S. 51, 15 Sup. Ct. 273, 39 L. Ed. 343; U. S. v. Marchant, 12 Wheat. 480, 6 L. Ed. 700.

"That some defendants had a very small part in wrongdoing as compared with others does not reasonably entitle them to separate trials, if all the doings of all the defendants are (by the nature of the charge) to be proven as ejusdem generis." Schwartzberg v. U. S., 241 Fed. 348, 154 C. C. A. 228.

[12] Separation of the jury during the trial is also complained of. This also was within the discretion of the trial court; care being taken to properly caution the jury against permitting any outside influences. This was done in the instant case. Furthermore, no defendant requested that any other course be pursued. It is also complained that government's counsel by improper invective prejudiced the rights of plaintiffs in error. Granting that some of the statements of government's counsel were highly colored, we are not prepared to say that the remarks were so far outside the evidence and inferences legitimately to be derived therefrom as the same was viewed from the government's standpoint as to be erroneous. Quite certainly no error in the handling thereof by the trial court can be predicated thereon.

[13] During the course of the trial the defendant Troost approached one of the jurors, and in substance said that he should never have been tried with Mr. Ader; that he should have been tried separately; that he should never have been indicted. The juror thus approached reported the incident to the trial judge, who, in the absence of the jury, informed the attorneys. It appears further that the juror reported to the court that he could hardly recall what it was that Troost said; that he did not pay any attention to him; and that the court instructed the juror to forget it and not communicate about it to any other juror. No motion to withdraw the juror was made by counsel for the plaintiffs in error. Apparently the incident was not considered serious nor prejudicial, or plaintiffs in error thought best to proceed with the case. Manifestly, we think, it was the duty of the defendants to ask leave to withdraw a juror on that ground if they then deemed themselves prejudiced by the incident. Having determined to take chances of a favorable verdict, no error can now be predicated upon the incident.

[14] After verdict plaintiffs in error filed a motion for a new trial and in support of such motions offered affidavits disclosing newspaper accounts dealing with the incident above referred to, wherein one of the defendants (Troost) approached one of the jurors and had some conversation with him. The trial court considered the affidavits and denied the motion. Having exercised his discretion, no exception can be sustained to his denial of the motion. Katz v. U. S. (C. C. A.) 273 Fed. 157. This case is readily distinguished from that of Mattox v. U. S., 146 U. S. 140, 13 Sup. Ct. 50, 36 L. Ed. 917, and Ogden v. U. S., 112 Fed. 523, 50 C. C. A. 380, wherein the trial court declined to exercise its discretion, and also readily distinguishable from the case

of Simmons v. U. S., 142 U. S. 148, 12 Sup. Ct. 171, 35 L. Ed. 968, wherein the Supreme Court approved of the exercise of the discretion of the court in permitting the withdrawal of a juror and directing a new trial. In fact, we see no reason to disagree with the trial court in the exercise of his discretion.

[15] Claim is made that certain instructions of the trial court were erroneous. No objection nor exception was made to the instructions in the court below, and hence they are not now properly reviewable here. Lewis v. U. S., 146 U. S. 370, 13 Sup. Ct. 136, 36 L. Ed. 1011; Hickory v. U. S., 151 U. S. 303, 14 Sup. Ct. 334, 38 L. Ed. 170; St. Clair v. U. S., 154 U. S. 134, 14 Sup. Ct. 1002, 38 L. Ed. 936; Rosenblatt v. U. S. (C. C. A.) 271 Fed. 435. However, in view of the other incidents claimed by plaintiffs in error to have rendered the trial below unfair, we have scanned the instructions, and are of the opinion that they are substantially free from objectionable matter, and on the whole record we conclude that neither of the plaintiffs in error was denied any substantial right whereby a fair trial was prevented, and hence that the judgments of the trial court should be, and they are, affirmed.