**OLMSTEAD et al. v. UNITED STATES.**[*]

Circuit Court of Appeals, Ninth Circuit.
November 19, 1928.

No. 5532.

[*]Rehearing denied January 14, 1929.

Chester A. Sheppard, Sheppard, Phillips & Ralston, and Martin L. Pipes, all of Portland, Or., for appellant Olmstead.

Joseph, Haney & Littlefield and John C. Veatch, all of Portland, Or., for appellant Wheeler.

George Neuner, U. S. Atty., of Portland, Or.

Before RUDKIN and DIETRICH, Circuit Judges, and NORCROSS, District Judge.

DIETRICH, Circuit Judge. At all times herein mentioned appellant Emery Olmstead was a director and the president of the Northwestern National Bank of Portland, Or., actively engaged in the transaction of its business, and appellant Wheeler was a large stockholder and customer of the bank. Through corporations and in his own name Wheeler transacted business on an extensive scale and carried several accounts in the bank, referred to in banking circles and the record as "the Wheeler lines." To some extent the two were associated in business other than the bank. One of the companies operated by Wheeler was the McCormick Lumber Company, carrying on a lumbering business at McCormick, Wash., and in the main its relations and dealings with the bank constitute the subject-matter of the record.

Both appellants were acquitted on the first count in the indictment, charging them with conspiring to misapply the funds of the bank, and were convicted and by the court adjudged guilty upon each of the other 22

counts charging Olmstead with the misapplication of funds and Wheeler with aiding and abetting him in such misapplication. The method by which the government contends the bank was despoiled consisted of the honoring of checks or drafts drawn upon it by the McCormick Lumber Company through Wheeler, its president, when in fact it had no funds in the bank for the payment thereof, as both of the defendants knew.

Under their first assignment, appellants urge that it was error to overrule their demurrer challenging the sufficiency of the indictment. Stated in brief, their contentions are (1) that the indictment fails to charge that Olmstead was vested with power to honor the checks; (2) that it fails to charge that Olmstead honored such paper as president of the bank, or without the consent of its board of directors; (3) it fails to set out in form or substance the credit appearing in the books of the bank in favor of the McCormick Lumber Company, referred to as false and fictitious, or to exhibit any facts showing that such was its character; and (4) that it fails to charge Olmstead had knowledge that it was false or fictitious.

As said by Mr. Justice Brown, speaking for the court in Cochran v. United States, 157 U. S. 290, 15 S. Ct. 630, 39 L. Ed. 704:

"Few indictments under the national banking law are so skillfully drawn as to be beyond the hypercriticism of astute counsel—few which might not be made more definite by additional allegations. But the true test is, not whether it might possibly have been made more certain, but whether it contains every element of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former acquittal or conviction. Evans v. United States, 153 U. S. 584, 587, 588 [14 S. Ct. 934, 38 L. Ed. 830]; Batchelor v. United States, 156 U. S. 426 [15 S. Ct. 446, 39 L. Ed. 478]."

We are of the opinion that fairly construed the indictment meets this test. With the exception of dates and amounts the several counts are in identical language, and we may therefore specifically refer to the second as typical of all. It alleges that on December 13, 1926, at Portland, Or., Olmstead, being a director and the president of the bank, the national status of which is fully set forth, and "being then and there actively engaged in the management of the business and affairs" thereof, "and, as such director and officer, possessing such a power of control, direction, and management over the moneys, funds and credits * * * as enabled him to take part in the committing of the offense" charged, and being such director and president, "and having the power of control, direction and management over the business and affairs" of the bank, "with intent then and there to injure and defraud" the bank, he did unlawfully and willfully misapply the funds and credits in the sum of $3,035.23, by transferring and converting the same to the use of the McCormick Lumber Company, by honoring and paying that company's check on the bank in that amount, when as Olmstead well knew "no such sum then stood to the credit of said corporation with or upon the books of the" bank for the payment thereof, "except a false, fraudulent and fictitious credit, and no security then was or had been given for the repayment" of the money, "and when, as said Emery Olmstead then and there well knew, the company was in a failing and insolvent condition and unable to pay its debts or meet its obligations and had no reasonable prospect of being able to do so," so that Olmstead then and there well knew "there was every probability that the said sum of money would be, as it in fact was, wholly lost to" the bank.

Together with the averments so in substance set forth are others to the effect that Wheeler knowingly and feloniously aided and abetted Olmstead in making such misapplication. A charge of similar form was under consideration in Coffin v. United States, 156 U. S. 450, 15 S. Ct. 401, 39 L. Ed. 481, and the court there said:

"We take the second as an example. That charges that Haughey, being president of the Indianapolis Bank, did then and there by virtue of his office as president of said bank unlawfully, feloniously, and willfully misapply the moneys, funds, and credits of the bank, with intent to convert the same to the use of the Indianapolis Cabinet Company, by then and there causing said sum to be paid out of the moneys, funds, and credits of the bank, upon a check drawn upon the bank by the Indianapolis Cabinet Company, which check was then and there cashed and paid out of the funds and credit of the bank; which sum, and no part thereof, was the said Indianapolis Cabinet Company entitled to withdraw from the bank, because said company had no funds in the bank, and that the said company was then and there insolvent, which Haughey then and there well knew, whereby said sum became lost to the bank. This clearly states the misapplication and

actual conversion of the money by the methods described, that is to say, by paying it out of the funds of the bank to a designated person when that person was not entitled to take the funds, and that owing to the insolvency of such person the money was lost to the bank. The fact that the count charges the intent to convert money to the use of the Indianapolis Cabinet Company does not obliterate the clear statement of the actual conversion. In this regard the count is clearer and stronger than that held sufficient in Evans v. United States, supra."

We think the relation of Olmstead to the bank and his authority and power over its business and funds are sufficiently alleged. It was unnecessary to charge in what manner he came into control. If, as averred, he in fact exercised control and actually managed the business, it is immaterial whether his authority originated in a formal resolution of the directors or resulted from their acquiescence and informal consent. Evans v. United States, 153 U. S. 584, 14 S. Ct. 934, 38 L. Ed. 830; Claasen v. United States, 142 U. S. 140, 12 S. Ct. 169, 35 L. Ed. 966; United States v. Northway, 120 U. S. 327, 7 S. Ct. 580, 30 L. Ed. 664. Nor was it necessary to aver that in misapplying the funds of the bank he acted without the knowledge or consent of the directors. United States v. Eno (C. C.) 56 F. 218; Flickinger v. United States (C. C. A.) 150 F. 1; United States v. Morse (C. C.) 161 F. 429; Sheridan v. United States (C. C. A. 9th) 236 F. 305.

While the averments touching the "fictitious credit" might with propriety have been amplified, it is to be borne in mind that the reference thereto is only explanatory of the manner in which the offense, otherwise charged, was committed. It is alleged that on a day certain Olmstead with intent to injure and defraud the bank, unlawfully, feloniously, and willfully misapplied $3,035.23 of the bank's funds. That is the offense. He committed it by turning over the funds to the McCormick Lumber Company upon its check, when he well knew that no such sum stood to its credit, except a false, fraudulent and fictitious credit. Under a fair construction, we think the language imports knowledge that such credit as the McCormick Company appeared to have was in fact fictitious. Coffin v. United States, 156 U. S. page 448, 15 S. Ct. 394, 39 L. Ed. 481. All the elements of the offense were alleged, the manner in which the misapplication was made is clearly specified, and, if defendants desired greater certainty as to the character of the fictitious credit, they should have asked for it by special demurrer or demand for a bill of particulars. See Sheridan v. United States (C. C. A.) 236 F. 305; Jewett v. United States (C. C. A.) 100 F. 832, 53 A. L. R. 568.

A brief explanation of the general features of the case made by the voluminous evidence will be of aid in determining what, if any, merit there is in the other assignments urged upon our consideration. The specific misapplications covered by the several counts are all alleged as of dates in December, 1926, and February, 1927. The first count, however, charges a conspiracy covering the period from October, 1924, to March 2, 1927, and the evidence, much of it directly or remotely pertinent to the charges now under consideration, covers this entire period, and especially the last 11 months thereof. It seems that on October 9, 1924, the bank's board of directors passed a resolution instructing the officers not to permit any further overdrafts to Wheeler or the Portland Telegraph, which he controlled, and some time thereafter the account of the McCormick Lumber Company was closed out. But, under circumstances we do not stop to explain, its account was again opened on March 29, 1926, and continued active until early in March, 1927, when disclosures were made leading to this prosecution.

Referring particularly to this later period, Olmstead was president of the bank, was receiving an annual salary of $20,000, and from his own testimony it is clear he was the chief executive officer, and from him all others in the active service of the bank, including the cashier, took instructions. While the supervision of certain accounts and lines of credit was committed to others, he himself assumed personal control of the Wheeler lines, kept himself advised with respect thereto, and in considerable detail directed what should be and was done. The McCormick Lumber Company was operating at a loss, and was generally in pressing need of funds. To meet this need, through its president, the defendant Wheeler, it engaged in a course of check kiting of astonishing magnitude, daring, and persistency. It had accounts with five different banking institutions in Pennsylvania. There being need of replenishing its credit with the Portland bank, Wheeler would draw a check in its favor upon one of these eastern banks and deposit it in the Portland bank, where, if it was approved by Olmstead, it would at once be passed to its credit for use in honoring checks upon its account. In due course the check upon the Eastern bank was trans-

mitted for payment, in most instances rejected for want of funds, and returned to the Portland bank. Then it would be charged back to the lumber company's account, whereupon Wheeler, upon being advised, would issue another check upon an Eastern bank to cover the so-called overdraft, and the process would be repeated. The time required for such a round of procedure would necessarily be about 10 days, and might well be longer. In the earlier part of the period the checks were formally protested before they were returned, but later each check carried the instructions: "Do not wire fate. Do not protest." Between the 29th day of March, 1926, and March 2, 1927, checks of this character aggregating over $12,000,000 were returned and charged back against the lumber company's account out of a total drawn upon the Eastern banks of approximately $13,000,000. Of an aggregate of $10,770,357.20 drawn upon the Titusville Trust Company, not a single check was honored; the deposits of the lumber company in that institution during the period being only $16,500, and that amount having been applied in the payment of interest on Wheeler's obligations.

In such manner during this period the net aggregate amount of more than $700,000 of the Portland bank's funds, including the specific amounts set forth in the indictment, was transferred to and withdrawn by the lumber company, to the bank's loss. If the facts so stated are not shown by the testimony of the defendants themselves, or by indubitable proofs, in the most favorable view to defendants they rest upon conflicting evidence, or evidence from which diverse inferences may be drawn.

In defense of such extraordinary conduct Wheeler's contention is that during the period the lumber company was expecting funds from an anticipated sale of timber lands and from what are referred to as trade acceptances, which he was sending East for discount and credit to take care of the checks. Of the trade acceptances it may be said that the evidence tends strongly to show that some, if not most, of them were fictitious, and that upon the whole subject of funds, either from the discount of the acceptances or from the sale of timber lands, in the most favorable view to defendants, the question was for the jury whether the defendants acted reasonably and in good faith in relying upon such possible resources to meet the continual flow of checks.

One of the assignments urged, particularly by defendant Wheeler, is that the court erred in permitting the witness Waite to testify for the government touching the contents of certain writings. In defending the use of the overdraft checks upon the Eastern banks, Wheeler had testified to the sending East of trade acceptances of the lumber company in the expectation that they, or the proceeds thereof, would be credited to the accounts of the lumber company to cover the checks. In form these acceptances were drafts payable upon a day certain, drawn by the seller of logs upon, and accepted by, the lumber company, the purchaser. Presumably they would represent actual current transactions, by which the company was acquiring logs and thus adding to its assets; but on cross-examination of Wheeler it was shown that in many instances this was not true. Long after a lot of logs had been received and paid for, a draft was made out in the seller's name, or in the name of a dummy corporation held out as the vendor, by Wheeler or the employees of the McCormick Company, and, after its acceptance and the indorsement of Wheeler were placed thereon, it was sent East as a trade acceptance. In a general way and without objection from either side, Wheeler testified as to the contents of records and written instruments evidencing such procedure.

Upon being called by the government, Waite testified that during the period in question he was head bookkeeper for the McCormick Lumber Company and was familiar with the so-called trade acceptances used by it. He testified at length and in detail touching acceptances covering the period from 1924 to 1927, in which the Douglas Fir Logging Company appeared to be the vendor. He further testified that upon request of Wheeler, generally by telegram or letter, such instruments were made up and the signature of the logging company secured, and they were then sent to Wheeler at Portland for his use. These acceptances, he testified, were issued during the period from 1924 to 1927 without basis of actual sales or purchases of logs; in short, that they represented only fictitious transactions. He then testified that in 1926 and 1927 similar trade acceptances aggregating about $300,000, were gotten out in the name of one Smith, storekeeper for the McCormick Lumber Company, as ostensible seller, and they were sent to Wheeler, who had them discounted. The last bunch of these the witness himself prepared pursuant to instructions he received "from Portland to make up a bunch and send them down." He thought the instructions were in a note or letter received by mail

from Wheeler; it was customary to prepare such acceptances in denominations of $2,000. He personally never received the orders or instructions from Wheeler; they generally came to the McCormick Lumber Company, and the mail was opened by the manager, until toward the last, when the witness opened the mail, whereupon he simply complied with the requests, which were addressed to no one in particular, by following former procedure.

Up to this point no objection had been interposed, but, on a further inquiry as to the general import of such notes or letters from Wheeler touching the "Smith" paper, counsel for Wheeler objected upon the ground that the question called for the contents of written instruments. The witness then explained that such notes or letters "were filed under J. E. Wheeler's file, in the general correspondence file, and should be there in the McCormick Lumber Company's file." Apparently upon the theory that they were thus shown to be in defendant's possession, and hence not available to the government, the court overruled the objection. Whereupon, without receiving an answer to the question which had been asked, counsel for the government asked, "What instructions did you have with reference to drawing these trade acceptances of the Douglas Fir Logging Company and F. D. Smith?" to which the witness without objection replied, "The instructions were to make up a certain number of acceptances of the Douglas Fir Logging Company or F. D. Smith."

We have recited at length the circumstances of the incident, to make it clear that, whether the court was or was not right in assuming that the notes and letters were in defendant's possession, no reversible error was committed. There was no objection to the specific question that was answered. The answer purports to give only the general import or nature of instructions more or less commonly given, and added little, if anything, to what without any objection whatsoever the witness had already testified to. Indeed, the answer might be stricken without appreciably weakening the record. And in any view we are satisfied the ruling of the court was without prejudice.

Olmstead assigns certain alleged errors in the reception of evidence, but there is only meager reference to them in the briefs, and they are so plainly devoid of merit that we pass them without comment.

By Olmstead no exceptions were taken to the instructions given, and the two or three attempted by Wheeler are too vague to present any question for review. Both parties, however, asked for a direction to the jury to acquit, and for other special instructions, which were denied, and the denials they urge constitute reversible errors.

█ One of the contentions most urgently pressed under these specifications is disclosed in the following instruction requested by appellant Wheeler:

"In order for you to find the defendant Wheeler guilty, as charged in any of the counts herein, you must be convinced beyond a reasonable doubt that at the times the advances were made to the McCormick Lumber Company that the corporation was in a failing and insolvent condition, and unable to meet its debts, and had no reasonable prospect of being able to do so, and you must further find that no security was put up with the Northwestern National Bank to secure the repayment to that bank of the money so advanced."

Of course, the government must make a case within the scope of the indictment; but that is not to say that it must establish in full every allegation therein contained. If appellants both knowingly adopted the scheme here shown, by which, through the device of fictitious credits, large sums were to be and were withdrawn from the bank, would it be seriously asserted that such disbursements could not constitute misapplications within the meaning of the law and the scope of the charge, merely because the McCormick Company, though operating at a loss and nearly insolvent, could not be said to be wholly insolvent, or because the bank had some, but wholly inadequate, security? When we consider the magnitude of the sums thus diverted, we are inclined to think the deceptive course, so persistently pursued, of itself made a prima facie case of misapplication. Significance is added to the deceit by the fact that on May 19, 1926, the bank's board of directors had passed a resolution requiring that, in case of a loan of more than $5,000 and less than $25,000 to any person, the proposed loan first be approved by not less than three senior officers or members of the executive committee, and loans in excess of $25,000 first be approved by the executive committee.

Regardless of the question of the lumber company's solvency, it was the right of the directors, stockholders, and depositors to have the bank's funds loaned and paid out openly, in accordance with banking practice, and not under cover of a misleading subterfuge. But, however that may be, the only security it is suggested the bank had is some general

personal guaranty from Wheeler, said to have been evidenced by a letter from him to Olmstead, which, however, they were unable to produce. But, if we assume that he wrote such a letter, it is clear from the evidence as a whole that he was involved in a multitude of financial relations; he was unable to discount the acceptances of the lumber company in the East, though they were indorsed by him, and, as we have seen, he had been by the directors of the bank, in which he was a heavy stockholder, denied the privilege of overdrafts. Such security as the guaranty afforded was manifestly of doubtful present value. The evidence leaves no room for doubt that the lumber company was insolvent in the sense that it was chronically unable to meet its obligations as they matured, and tends strongly to show insolvency in the sense that its liabilities exceeded the fair market value of its assets.

Furthermore, on July 13, 1926, the executive committee of the bank, having authority from the directors so to do, revoked the line of credit which had theretofore been extended to it. The exigencies of banking require that the assets of a bank in the form of loans be measurably liquid; but obviously such a condition cannot be maintained, if loans are made in excessive amounts to single borrowers, or are made to borrowers who are not likely to have the ability to meet their obligations when they mature. It is manifest that, the moment the funds of the bank were turned over to the lumber company upon these so-called overdraft loans, they no longer remained a liquid but became a frozen asset, and with entire propriety the jury could have found such disbursements to have been misapplications, without first finding that the lumber company was entirely insolvent or that the bank was wholly without security. The court did fully advise the jury that, in considering the intent of appellants to injure or defraud, they should take into consideration the financial standing of Wheeler and the McCormick Company, and the appellants' reasonable belief in respect thereto. A more favorable instruction they could not ask.

█ It is also argued that, because the aggregate of the misapplications specifically charged in the 22 counts approximated only $69,000 out of a total of the same general character of 10 times that sum, and because during the period covered by these counts real deposits to the credit of the McCormick account were in excess of $69,000, it must be presumed that the checks counted upon as constituting the means of the unlawful diversion were payable and paid out of such actual deposits. We cannot recognize such a presumption of law. The government adduced evidence in explanation of the circumstances and conditions under which each alleged misapplication check was presented and paid, and the status of the account of the McCormick Company both before and after such payment, and the character of the account at the time. Appellants do not assign as error the failure to give any requested specific instruction applicable to the evidence, or the giving of any specific instruction on the subject, but for the assignment rely wholly upon the ruling upon the motion for a directed verdict. But clearly we think it was a question for the jury, in respect to each count, whether the check therein referred to was payable or paid out of a real credit of the McCormick Company, or was honored by charging it against the fictitious credit.

█ Nor do we think that, because some of the checks referred to in the indictment as the means by which the funds were withdrawn from the bank were honored in the first place by issuing cashier's checks, there was a variance. The checks were thus paid to the depletion of "the moneys, funds and credits" of the bank. See Rieger v. United States (C. C. A.) 107 F. 916. In that connection appellants also urge that "these cashier's checks conclusively prove that they were issued by the authority of the board of directors of the bank," and hence, if Olmstead "did anything to have the checks so honored, it was by virtue of an authority from the board of directors." The argument seems to be that such a presumption arises from the fact that section 5209 of the Revised Statutes of the United States (12 US CA § 592) makes it an offense for any one without authority of the directors to issue, among other things, a "bill of exchange," and that a cashier's check is a bill of exchange; the conclusion being that, because the indictment does not negative this supposed presumption, it must be taken as conclusive that in so honoring the McCormick Company's checks Olmstead acted pursuant to authority from his board.

█ It is not necessary in an indictment to negative all possible defenses, or to set forth merely evidentiary facts, and we are aware of no presumption, arising from the fact that a bank officer knowingly issues a cashier's check without consideration, that the board authorized the illegal transaction. We shall not presume that the board of directors authorized the performance of a criminal act. If either Olmstead or a subordinate, for

cash or upon a check against a valid credit, had issued a cashier's check, such presumption of authority would naturally be indulged, but not where the cashier's check was issued against a credit known to be fictitious and fraudulent.

There is an argument to the effect that the evidence discloses no false entry, but we are not here concerned with the statutory offense of making a false entry. The formal bank transactions were truly entered in its records. The wrong charged consisted of receiving, and correctly entering from a bookkeeping standpoint, checks which were known to be in fact worthless, and thus creating an apparent, but fictitious, credit under the guise of using which the funds of the bank were to be and were drawn out and dissipated.

There is a further contention, based upon requests refused, and vaguely suggested in Wheeler's exceptions to the charge given, that the court erred in respect to instructions upon the question of the meaning of intent to injure or defraud, as used in the statute, and of how such intent may be shown, and of the inferences to be drawn in respect thereto from an act willfully done by defendants, and the presumption that the natural and probable consequences of an act were intended. But upon analysis we find the instructions given upon the several phases of the question comprehensive, clear, and fair. We do not set them out, because they are of unusual length; the court having not only stated the general principles, with their qualifications, but directed the attention of the jurors to the several aspects of the case, with a view to enabling them to apply such principles intelligently.

The judgment will be affirmed.