**PARMAGINI et al. v. UNITED STATES.***

No. 6064.

Circuit Court of Appeals, Ninth Circuit.

July 28, 1930.

RUDKIN, Circuit Judge, dissenting.

*Rehearing denied November 17, 1930.

Otto Christensen, of Los Angeles, Cal., for appellant Parmagini.

Robert B. McMillan, of San Francisco, Cal., for appellant Levin.

Geo. J. Hatfield, U. S. Atty., and George N. Crocker, Asst. U. S. Atty., both of San Francisco, Cal.

Before RUDKIN and WILBUR, Circuit Judges, and KERRIGAN, District Judge.

WILBUR, Circuit Judge.

The indictment in this case was entitled, "In the Southern Division of the United States District Court for the Northern District of California." The first count charged that the defendants, hereinafter called "said accused," on September 28, 1929, in the city and county of San Francisco, within said southern division, unlawfully did sell and distribute, not in nor from the original stamped package, a lot of morphine, in quantity particularly described as approximately five ounces. The second count charged that then and there, within said Southern division, the said accused fraudulently and knowingly did conceal, and facilitate the concealment of, the said lot of morphine, and that the said morphine had been imported into the United States of America contrary to law, as said accused then and there well knew. The third count charged that then and there, within said Southern division, the said accused unlawfully did dispense and distribute, not in nor from the original stamped package, a lot of opium, in quantity particularly described as approximately one ounce of crude gum opium. The fourth count charged that then and there, within said Southern division, the said accused fraudulently and knowingly did conceal, and facilitate the concealment of, the said lot of opium, and that the said opium had been imported into the United States of America contrary to law, as said accused then and there well knew. The fifth count charged that, at a time and place to the grand jurors unknown, the said accused unlawfully did conspire to sell and dispense and distribute morphine and opium, not in nor from the original stamped package, and to conceal and facilitate the concealment and transportation of morphine and opium which had been imported into the United States of America contrary to law, as said accused then and there well knew, and that thereafter, and during said conspiracy, one or more of said accused did, in the city and county of San Francisco, state of California, and within the Southern division of the Northern district of California, commit certain overt acts, set forth in detail, to effect the object of the conspiracy. The jury returned a verdict of guilty as to all counts, and from the judgment on the verdict this appeal was prosecuted.

It is first contended that the second, third, and fourth counts of the indictment are bad for want of an allegation of time or place; for want of a sufficient description of the morphine and opium; and for want of a sufficient allegation of venue. The first count charged the venue in explicit terms, and the remaining counts fix the venue by use of the words then and there within said Southern division; the first count described the morphine, and the second count described it as said lot of morphine; the third count described the opium, and the fourth count described it as said lot of opium. These allegations as to time, place, venue, and description are sufficient under well-settled rules of criminal pleading. Blitz v. United States, 153 U. S. 308, 14 S. Ct. 924, 38 L. Ed. 725; Connor v. United States (C. C. A.) 293 F. 391; Adamson v. United States (C. C. A.) 296 F. 110.

It is further contended that the fifth count is bad for want of an allegation of venue, because the count charged that the parties conspired at a time and place to the grand jurors unknown; but the count specifically charged that the overt acts to effect the object of the conspiracy were committed within the jurisdiction of the court, and such an allegaton of venue is sufficient under the law. Woitte v. United States (C. C. A.) 19 F.(2d) 506, and cases there cited.

One of the narcotic agents testified that upon the arrest of the appellant Levin they found automobile keys on his person, and that Levin informed them where the automobile could be found, giving a description of it. The witness was then permitted to testify, over objection and exception, that he found in the automobile a pistol loaded with dumdum bullets. It is not claimed that either the automobile or the pistol was used in the commission of the crime charged in the indictment, or that they were present or nearby when the crime was committed. It seems quite manifest, therefore, that the mere presence of the pistol in the automobile had not the slightest tendency to prove that the owner of the car had dealt in or concealed narcotics at some time prior thereto, any more than it would tend to prove the commission of any other crime, such as crossing the street in the middle of a block in defiance of a municipal ordinance. The court doubtless ap-

preciated this, for later in the course of the trial it withdrew the testimony from the consideration of the jury and instructed them to disregard it.

On the cross-examination of the appellant Parmagini, the attorney for the government propounded the following question: "Why did you send word to me that if I would continue your trial for six months that you (would) make revelations in relation to the narcotic ring operating on the Pacific Coast?" An objection to this question was overruled, and the question was not answered. On the contrary, after the objection to the question was overruled, the witness asked the district attorney: "By who?" Thereafter the questions asked and answered were received in evidence without any objection or exception on the part of the defendant. In a recent opinion of this court by Judge Dietrich [Olmstead v. U. S., 29 F.(2d) 239] it was held that, where a question to which objection was made was not answered, the exception to the ruling could not be taken advantage of with reference to subsequent questions and answers. In the case at bar the objectionable assumption by the district attorney was withdrawn in reframing the question, and no objection was interposed to the question thus asked. On direct examination the appellant had testified as follows: "I never unlawfully dispensed or distributed upon those dates any morphine not in the original sealed packages. I was never a part of a conspiracy with William Levin or any other person to facilitate the transportation or sale of morphine and never entered into a conspiracy to conceal morphine or any other drug with those persons or with any persons, or to violate the Harrison Narcotic Law or the Jones-Miller Law, upon the dates I have mentioned or upon any other dates or at any other dates or at any time or at any place."

And on cross-examination he further testified: "I have never had anything to do with narcotic drugs at any time or at any place." It was this last sweeping declaration of the witness on cross-examination that immediately provoked the question now under consideration. If the defendant did in fact make an offer to the district attorney to reveal the secrets of a narcotic ring operating illegally on the Pacific Coast, his conduct and offer was inconsistent with this testimony on direct examination, and also that on cross-examination, and therefore a proper subject of cross-examination. Therefore, the objection to the question on the ground that it was "immaterial, irrelevent and incompetent and not proper cross examination and no foundation laid" is not well taken. The question was proper cross-examination. The ruling of the court was correct.

The vice in the question is the assumption on the part of the district attorney involved by the form of the question, "Why did you," etc. If the district attorney propounded the question in the form in which it was asked with a view of insinuating as a fact to the jury that which he knew was not true, it would undoubtedly be most serious misconduct on his part. There is nothing in the record, however, to disclose that the question propounded by the district attorney was not propounded in good faith, other than the denial of the defendant that he had not authorized any one to make overtures to the district attorney. The presumption of official duty properly performed would involve the presumption that the question was asked in good faith. The prompt reframing of the question to remove the objectionable implication, notwithstanding a favorable ruling of the court, would seem to indicate a purpose to remove that implication, although its objectionable character had neither been pointed out by court or counsel. The defendant did not assign the asking of the question by the district attorney as misconduct, and did not then or thereafter ask the court to instruct the jury to disregard it, and under these circumstances he is not entitled to present the matter on appeal under well-recognized principles which are uniformly adhered to except in those extraordinary cases where the appellate court can see that the misconduct of the district attorney in asking the question is so flagrant that it could not be cured in any manner. New York Central R. R. Co. v. Johnson, 279 U. S. 310, 318, 49 S. Ct. 300, 73 L. Ed. 706, citing Brasfield v. U. S., 272 U. S. 448, 450, 47 S. Ct. 135, 71 L. Ed. 345.

The appellant did not assign the conduct of the district attorney in asking the question as misconduct either in his assignment of errors or in the specification of errors in his brief. The objection, the assignment of errors for the appeal, and the specification of errors in the brief are all predicated upon the theory that the question objected to was immaterial and not proper cross-examination. He did not raise the question of the good faith of the district attorney in propounding the questions. The witness testified without objection as follows:

"Mr. Hatfield. Q. Did you ever have word sent to me that if this case was continued for six months that you would afford

the government valuable evidence of the Pacific Coast narcotic traffic? A. No.

"Q. You never did? A. No.

"Q. Did you ever have your counsel have that word sent to me? A. No.

"Q. How many people have you talked to— A. Several people.

"Q. Just a minute. How many people have you talked to since your indictment about seeing me to try to fix this case? A. Nobody that I spoke to about fixing the case.

"Q. Do you know Gus Oliva? A. Yes.

"Q. Have you ever talked to Gus Oliva about this case since your indictment. A. Yes.

"Q. Did you say anything to Gus Oliva, to see me or to see my friends about fixing this case? A. No.

"Q. You are sure of that? A. Yes, I am absolutely sure of that.

"Q. Absolutely positive? A. Absolutely positive.

"Q. You have never talked to anyone else? A. No."

The question as to fixing the case brought in an entirely new subject, unless it was also thereby intended to refer to efforts of the defendant to turn state's evidence. In the absence of objection, or exception or assignment at the time, it is unnecessary to speculate upon the meaning of the question or its answer. See Continental Cas. Co. v. Pouquette (C. C. A.) 28 F.(2d) 958; Greer v. U. S. (C. C. A.) 240 F. 320, affirmed 245 U. S. 559, 38 S. Ct. 209, 62 L. Ed. 469.

■ With reference to the finding of the gun in an automobile belonging to Levin and opened with a key furnished by him to the officers, and searched at the time of the arrest of Levin, the evidence was introduced solely as to defendant Levin. The court having stricken the evidence out and instructed the jury to disregard it, the jury are presumed to have done so. There is nothing in the possession of a gun which tends to prove that the possessor is guilty of selling or concealing narcotics, nor is there anything in such evidence so inherently prejudicial as to justify us in assuming that the jury disregarded the instructions of the court to ignore the evidence.

■ The defendants were each sentenced to five years for selling morphine from original unstamped packages, and for ten years, to run consecutively thereafter, for concealing the same morphine that had been illegally imported, and also sentenced to run concurrently therewith for five years for distributing opium from an unstamped original package, and ten years for concealing the same opium illegally imported. The charges for distributing opium and concealing unlawfully imported opium ran consecutively as to each other. Thus the total sentence as to each drug was fifteen years. In addition, the appellants were sentenced to two years' imprisonment upon the conspiracy charge for conspiring to sell opium and morphine. Fines were also imposed upon each count of the five counts aggregating $24,000. The evidence shows a single transaction for the sale of five ounces of morphine, and also shows that there was delivered with said morphine an ounce of crude opium adhering to the bottom of the container in which the morphine was delivered. The evidence is silent as to the reason for the delivery of this crude opium. It is not charged in the indictment that this opium was sold but that it was distributed. The penalty for distribution is the same as for a sale. The evidence shows that the packages of narcotics were not stamped as required by law, and this raises a presumption of illegal importation. The appellant contends that, as there is only one sale or distribution, there should be only one punishment, and also claims that, although there are two drugs involved in the sale or distribution, this did not make two separate offenses.

■ The appellee contends that count I, alleging sale of the morphine, and count III, alleging the distribution of the crude gum opium, were charges brought under the Harrison Narcotic Act (26 USCA § 692; 38 Stat. 785; 40 Stat. 1130; 42 Stat. 298; 43 Stat. 328; 44 Stat. 96), and that the charge of selling illegally imported narcotics contained in the second and fourth counts are brought under the Jones-Miller Act (21 USCA § 174; 38 Stat. 275; 42 Stat. 596; 43 Stat. 657). Both laws are in effect. Copperthwaite v. U. S. (C. C. A.) 37 F.(2d) 846. The Jones-Miller Act (21 USCA § 174) provides for the punishment of a person who imports any narcotic drug into the United States contrary to law, or who "assists in so doing or receives, conceals, buys, sells, or in any manner facilitates the transportation, concealment, or sale of any such narcotic drug after being imported or brought in, knowing the same to have been imported contrary to law," by a fine of not more than $5,000, and by imprisonment for not more than ten years. Under this law concealment and sale are distinct offenses, and therefore each act is punishable, although both occur in connection

with a single transaction. See, on this subject, Gavieres v. U. S., 220 U. S. 338, 31 S. Ct. 421, 55 L. Ed. 489; Ebeling v. Morgan, 237 U. S. 625, 35 S. Ct. 710, 59 L. Ed. 1151; Roark v. U. S. (C. C. A.) 17 F.(2d) 570, 51 A. L. R. 870; Albrecht v. U. S., 273 U. S. 1, 47 S. Ct. 250, 71 L. Ed. 505. The count which states that the defendant sold morphine and concealed morphine states two distinct offenses whether the charge of selling is under the Jones-Miller Act (21 USCA § 174) or under the Harrison Narcotic Law (26 USCA § 692). Therefore, consecutive sentences of five years for selling morphine and ten years for concealing morphine illegally imported were proper and in the discretion of the trial court might be made to run consecutively. The fact that the first count omits a necessary allegation to charge a sale in violation of the Jones-Miller Act, in that it is not alleged in the first count of the indictment that the morphine was illegally imported, does not change the situation, for under both acts the sale is punishable as an offense separate and distinct from that of the concealment of illegally importing morphine. It follows that the sentence for five and ten years consecutively and for the fine of $2,000 and $5,000 upon the morphine charge was proper.

■ The last count of conspiracy to violate these laws is a separate and distinct offense punishable as such. Ader v. U. S. (C. C. A.) 284 F. 13; Brady v. U. S. (C. C. A.) 24 F. (2d) 405, 59 A. L. R. 563. This adds two years to the sentence, making a total of seventeen years, and $10,000 to the fine of $7,000 on the morphine charge.

■ The question as to whether or not the charges with reference to the distribution and concealment of the opium can be considered a separate and distinct offense is a more difficult one. As the appellant points out, in the Circuit Court of Appeals of the Eighth Circuit, in Braden v. U. S., 270 F. 441, 443, a defendant was charged in five separate counts with having five distinct narcotic drugs in his possession at the same time. The court held that only one offense was committed, stating:

"It is further contended that the sentence imposed by the trial court is excessive. This contention is based on the fact that, although defendant was convicted on four counts, the transaction upon which said four counts are based was the finding of defendant in possession on the 16th day of November, 1918, at his flat in St. Paul, Minn., of the four different drugs mentioned in counts 6, 7, 8, and 9, said drugs being morphine sulphate, cocaine,

heroin, and smoking opium, all derivatives of opium except cocaine, which is a derivative of cocoa leaves. Counsel for the United States contend that the words 'any of the aforesaid drugs,' as used in section 8, permit him to base a count upon each drug found in the possession of the defendant although the drugs were all found at the same time and place. We do not think that any such significance can be given to the word 'any.' The use of this word simply means that, if the defendant under the required circumstances should be found in possession of any of said drugs, he would be guilty. If a person steals four horses from the barn of another, all being of different color, it would not be competent to charge the thief with four different larcenies when the horses were all taken at the same time and place. Another illustration would be the larceny of articles of merchandise from a store. If twelve articles were all taken at the same time and place, we do not think it would be competent to charge the thief with twelve different larcenies. If the test as to whether there were four different offenses arising out of the transaction in this case or only one was as stated by this court in Munson v. McClaughry, 198 F. 72, 117 C. C. A. 180, 42 L. R. A. (N. S.) 302, and followed in Stevens v. McClaughry, 207 F. 18, 125 C. C. A. 102, 51 L. R. A. (N. S.) 390, there would be no question in our opinion but that the facts in this case constituted but one offense."

■ With reference to counts I and III, one for selling morphine and the other for distributing opium, the transaction was an entirety, the delivery of the opium was a mere incident to the delivery of the morphine, and the transaction comes clearly within the rule stated by the Circuit Court of Appeals of the Eighth Circuit in the last-mentioned case. It follows that the fine and punishment for distributing opium were imposed for the same offense as the fine and punishment for selling morphine, as the terms of imprisonment run concurrently and the judgment is not prejudicially erroneous in that respect. Rosenberg v. U. S. (C. C. A.) 13 F.(2d) 369; White v. U. S. (C. C. A.) 16 F.(2d) 870. With reference to the concealment of morphine and the opium, the punishment allotted by law was for the concealment of "any narcotic drug." 21 USCA § 174. Where opium and morphine were concealed in a single package, only one offense is committed by such concealment regardless of the fact that more than one narcotic drug is contained in the package. Braden v. U. S. (C. C. A.) 270 F. 441, supra. It follows that the punishment for con-

cealing morphine and opium in this case were for the same offense, but as these two ten-year sentences run concurrently, the error is not prejudicial as to the terms of the sentence, and is important only as to the fine imposed. The judgment is modified by striking out the fine of $5,000 upon the charge of concealing opium and $2,000 upon the charge of distributing opium, a total of $7,000.

The sentences aggregating seventeen years in the penitentiary are affirmed. The judgment for the payment of fine is reduced to $17,000, and as modified is affirmed.

RUDKIN, Circuit Judge (dissenting).

One of the narcotic agents testified that upon the arrest of the appellant Levin they found automobile keys on his person, and that Levin informed them where the automobile could be found, giving a description of it. The witness was then permitted to testify, over objection and exception, that he found in the automobile a pistol loaded with dumdum bullets. It was not claimed that either the automobile or the pistol was used in the commission of the crimes charged in the indictment, or that they were even present or nearby when the crime was committed. It seems quite manifest, therefore, that the mere presence of the loaded pistol in the automobile had not the slightest tendency to prove that the owner of the car had dealt in or concealed narcotics at some time prior thereto, any more than it would tend to prove the commission of any other crime, such as crossing the street in the middle of a block in defiance of a municipal ordinance. It seems equally manifest that the testimony was not offered for any such purpose, but for the sole purpose of prejudicing the appellant in the eyes of the jury. The court below doubtless appreciated this, for later in the course of the trial, on its own motion, it withdrew the testimony from the consideration of the jury and instructed them to disregard it.

On the cross-examination of the appellant Parmagini, the attorney for the government propounded the following question: "Why did you send word to me that if I would continue your trial for six months that you (would) make revelations in relation to the narcotic ring operating on the Pacific Coast?" An objection to the question was overruled and an exception allowed. The question itself was both improper and prejudicial. The attorney for the government in effect informed the jury that the appellant had sent an emissary or emissaries to him to bargain for favors, perhaps for ultimate immunity, un-

der a promise that he would make revelations concerning the operation of an opium ring on the Pacific Coast. But how could such revelations be made unless the witness was a part or parcel of that ring or had dealings with it? At least, such was a proper, if not the only, inference to be drawn from the question. All of the authorities agree that a question thus assuming facts not in evidence is improper and may be prejudicial. Wharton's Criminal Evidence (10th Ed.) p. 58; Leo v. State, 63 Neb. 723, 89 N. W. 303; State v. Fournier, 108 Minn. 402, 122 N. W. 329; People v. Wells, 100 Cal. 459, 34 P. 1078, 1079. In the latter case the court said: "It would be an impeachment of the legal learning of the counsel for the people to intimate that he did not know the question to be improper, and wholly unjustifiable. Its only purpose, therefore, was to get before the jury a statement, in the guise of a question, that would prejudice them against appellant. * * * Where the clear purpose is to prejudice the jury against the defendant in a vital matter by the mere asking of the questions, then a judgment against the defendant will be reversed, although objections to the questions were sustained, unless it appears that the questions could not have influenced the verdict." See, also, Filippelli v. United States (C. C. A.) 6 F.(2d) 121.

But it is contended that the objection to the question was insufficient. True, it was the stock form of objection, incompetent, irrelevant, and immaterial; but the vice in the question was so apparent that any form of objection was sufficient to attract the attention of the court. Sparf and Hansen v. United States, 156 U. S. 51, 57, 15 S. Ct. 273, 39 L. Ed. 343; Sparks v. Oklahoma (C. C. A.) 146 F. 371, 374. Again, it may be said that the question was answered in the negative; but how can we know whether the jury accepted the statement of the accused as against the statement of the supposedly impartial representative of public justice?

In an ordinary case, errors such as these might be passed over as not prejudicial, but a case like this is out of the ordinary, and slight errors may well prove to be prejudicial. Illicit traffic in narcotics is today looked upon by the vast majority of mankind as one of the most infamous crimes known to the law, and a defendant charged with such a crime carries a heavy burden. He is confronted with presumption after presumption, more or less arbitrary in their nature, and the principal witness against him is usually an habitue of the underworld, whose testimony

would not be credited in any other field of litigation, especially if it were known that he was afforded an opportunity to make merchandise of his oath. Such was the principal witness for the government in this case, without whose testimony the verdict cannot stand. He served a term in the state penitentiary in California for grand larceny, and a term in the federal penitentiary for violation of the narcotic laws. Immediately upon his discharge from the latter institution he entered the employ of the government. To use his own words: "I have been employed here in the narcotic division since that time. I receive a regular wage. During that time, besides my wage or salary, I received honorarium. My employers promised me in this case that besides my salary an honorarium will be given me." What was meant by honorarium is left to the imagination; but had the appellants agreed to bestow a like honorarium on one of their witnesses, I apprehend it would be called by an uglier name. The witness was a twice-convicted felon and at the time of giving his testimony was living with a woman who was not his wife. Who she was or what she was we only know from the life she lived and the company she kept. His subsequent career of crime is a matter of common knowledge, but not a matter of record here. The right of the government to employ such a witness on such terms is not in question, but when it did employ him, with his prison record, his concubine and his honorarium, unrepentant and unreformed, it should not have been permitted to bolster up his testimony by prejudicial statements from the prosecutor, or by prejudicial testimony from other sources. And to inform the jury that one of the appellants was a gunman, in the parlance of the day, and that the other had agreed to make revelations concerning the operations of a narcotic ring on the Pacific Coast, was entirely out of place, to say the least, and would naturally, if not inevitably, tend to prejudice the jury.

Reversals because of the admission of improper testimony are to be regretted, but there is no other known way to safeguard the rights of those accused of crime. To condone error is to invite further error, and there is but one way to stop a practice which has become altogether too common.

We are not now concerned with the guilt or innocence of the accused, further than to say that without the testimony of the witness to whom we have referred the government made no case. Whether guilty or innocent, the appellants were entitled to have their case fairly tried, according to the established rules of law, and, as said by a learned judge, "though unfair means may happen to result in doing justice to the prisoner in the particular case, yet, justice so attained, is unjust and dangerous to the whole community." Hurd v. People, 25 Mich. 405.

You cannot suppress lawlessness by more lawlessness, nor can you inspire respect for the law by withholding its protection from those accused of crime.

The judgment should be reversed.